*In re* MARRIAGE OF KATHERINE S. (MEYER) KNOCHE, Petitioner-Appellant, and STEVEN G. MEYER, Respondent-Appellee.

Fifth District    No. 5—99—0762

Opinion filed May 23, 2001.

David M. Fahrenkamp, of Edwardsville, for appellant.

Roza Gossage, of Belleville, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Katherine S. (Meyer) Knoche (petitioner) appeals from an order of the circuit court of Madison County granting the petition of Steven G. Meyer (respondent) to modify the custody of the parties' daughter. The issues raised by petitioner on appeal are: (1) whether the trial court erred in excluding petitioner, who was appearing *pro se*, from the *in camera* interview of the child, (2) whether the trial court applied the proper standard of proof in transferring custody from petitioner to respondent, (3) whether the trial court's decision to modify custody was against the manifest weight of the evidence, and (4) whether the trial court's denial of a continuance to petitioner was an abuse of discretion. We affirm.

## FACTS

The parties were married on December 3, 1988. It was respondent's first marriage and petitioner's second. Petitioner had a daughter from her previous marriage. On September 21, 1989, the parties' only child, Chelsea, was born. On January 22, 1992, an order was entered by agreement, dissolving the parties' marriage, awarding custody of Chelsea to petitioner, and granting respondent certain reasonable visitation rights. Over the following years, numerous motions were filed by both parties on a variety of issues including, *inter alia*, child support, visitation, and venue. On April 4, 1996, respondent filed a motion to modify custody, seeking a transfer of custody of Chelsea from petitioner to respondent. On May 30, 1996, respondent filed an amended motion to modify custody, and that is the subject of the instant appeal.

On July 3, 1996, the trial court entered an order appointing a psychologist, Dr. Robert Clipper, to perform psychological evaluations of the parties. Before preparing his report, Dr. Clipper interviewed numerous people over an extended period of time. In particular, Dr. Clipper interviewed petitioner, respondent, Chelsea, and respondent's new wife. Dr. Clipper also interviewed two Department of Children and Family Services (Department) caseworkers and a police officer who investigated petitioner's report of alleged incidents of sexual abuse of Chelsea by Chelsea's stepgrandfather (respondent's new wife's father). Dr. Clipper filed an extensive report with the trial court on December 18, 1996.

As for the alleged incidents of sexual abuse, Dr. Clipper noted, "[The caseworkers and the police officer] found Chelsea, much as I did, as if she were merely reporting a story she heard." The Department determined that the alleged incidents were unfounded, and the trial court agreed. Overall, Dr. Clipper found respondent to be a "more stable and consistent parent to Chelsea" who is capable of setting aside his differences with petitioner for Chelsea's sake. Dr. Clipper opined that he does not believe that petitioner is capable of doing the same thing. Dr. Clipper noted that petitioner consistently disallowed respondent's visitation with Chelsea, despite police recommendations for her to recognize respondent's visitation rights, and that petitioner engaged in "dramatic scenes" and "histrionic outburst[s]." Ultimately, Dr. Clipper recommended transferring primary physical control of Chelsea from petitioner to respondent.

A hearing on respondent's petition to modify custody began on August 4, 1997. Seven witnesses testified for respondent, including Dr. Clipper, a police officer, petitioner's sixth husband, Roger Knoche, and four of petitioner's former boyfriends. At the end of the day, respondent was not finished presenting all his witnesses. The trial judge scheduled the hearing to resume on September 9, 1997, and explained to the parties that he had taken good notes and would not decide the case until he had heard all of the evidence. On September 2, 1997, petitioner's attorney filed a motion to continue, which the trial court granted. The hearing was then scheduled for February 25, 1998, but later rescheduled for March 12, 1998.

On October 23, 1997, petitioner's attorney filed a motion to withdraw on the basis that petitioner had refused to cooperate with counsel in that she had failed to pay the attorney for services rendered. Petitioner's attorney sent petitioner a letter in which he notified petitioner of the pending motion, which was scheduled for November 7, 1997, and explained that she had a right to appear at the hearing on the motion to withdraw, obtain new counsel to appear for her, or have 21 days to obtain new counsel or enter her own appearance. The motion to withdraw was granted on November 7, 1997. Petitioner did not appear at the hearing.

On February 17, 1998, respondent's lawyer sent a letter to petitioner in which she explained that because petitioner's attorney had withdrawn, petitioner might not know that the date of the hearing had been changed. Respondent's attorney went on to inform petitioner that the hearing was scheduled to resume on March 12, 1998. On March 4, 1998, the trial court ordered that a summons be sent to petitioner to inform her that all pending matters, including petitioner's former attorney's motion for attorney fees, were set for a

hearing. On March 12, 1998, the trial court reported that two days earlier, petitioner contacted his clerk and requested a continuance in order to obtain new counsel. The trial court informed petitioner that her request was denied. Petitioner attempted to get a continuance on the day of the hearing, but the trial court again denied the request, explaining that petitioner had plenty of time to get a new attorney but failed to do so. Petitioner then proceeded *pro se*. At the end of the day, the trial court took the case under advisement.

The evidence reflects that after the parties divorced, petitioner married and divorced four additional times and lived with at least four men that she did not marry. Petitioner moved to seven different residences during this time, and each time Chelsea moved with her. Petitioner's third marriage to Kenneth Spencer was short-lived, as a judgment of dissolution was entered on March 25, 1993, slightly more than a year after her divorce from respondent was entered. Petitioner married her fourth husband, Michael Martin, on September 3, 1993. That marriage lasted less than a year. She obtained an order of protection against him on November 1, 1993, alleging that Martin drank excessively and physically abused her. She also alleged that he left her children home alone when he was supposed to be babysitting. Chelsea was four years old at the time, and petitioner's oldest daughter was seven. Petitioner divorced Martin, but she remarried him on March 25, 1994.

Sometime after her second marriage to Martin (marriage number five), petitioner alleged that Martin sexually abused her oldest daughter, and she again filed for divorce. At the hearing on the instant matter, petitioner explained the allegations: "Michael Martin had been exposing himself, masturbating in front of my daughter and everything. So, yes, I did file charges against him for that." An order of dissolution was entered on December 8, 1994.

Petitioner married her sixth husband, Roger Knoche, in September 1995, and she divorced him on November 15, 1996. During her marriage to Mr. Knoche, she was still haunted by her previous husband, Michael Martin. In July 1996, she obtained an order of protection for her and Roger Knoche against Mr. Martin. Mr. Knoche also had a violent personality, as evidenced by photos submitted as part of the posttrial motion in the instant case showing petitioner with severe bruising, allegedly caused by a beating from Roger Knoche when she and Chelsea were residing with him.

The evidence also indicated that petitioner interfered with respondent's visitation on numerous occasions. Respondent was forced to file various motions to compel visitation, and ultimately petitioner was found in willful contempt for violating court-ordered visitation.

The record is replete with motions and cross-motions concerning visitation and court orders relating to visitation. Transcripts of messages that petitioner left on respondent's answering machine were introduced into evidence and reflect enormous hostility and anger on the part of petitioner and show that petitioner was indeed interfering with respondent's court-ordered visitation with Chelsea.

Petitioner attempted to explain her hostility on the basis that respondent's new wife intercepted her phone calls and interfered with her relationship with Chelsea. According to petitioner, respondent and his new wife are not so much concerned about Chelsea's well-being but, instead, have a "personal vendetta" against petitioner and harass her and "dig up dirt" to make her look bad. Petitioner realizes that she made some mistakes, but she considers herself a good and loving mother. She said she was tired of the "lies" respondent and his wife told about her and was "very sick and tired of the interference." Petitioner testified that her divorce from Roger Knoche was precipitated by respondent's "interference" and "badgering." Petitioner explained that she wants the fighting to stop and thinks that the parties should be able to work out their differences; however, she stated that they are unable to do that and everything ends in a fight.

The trial court conducted an *in camera* interview with Chelsea. Prior to the interview, the trial court explained to petitioner that since she did not have an attorney, she would not have anyone present during the *in camera* interview. Petitioner then inquired whether respondent's attorney would be allowed to talk to Chelsea. The trial judge told petitioner that he would not allow respondent's attorney to ask Chelsea any questions. During the interview, Chelsea stated a preference to remain with petitioner. Respondent's attorney was present during the interview. While the attorney did not ask questions directly to Chelsea, she did submit questions to the court for Chelsea to answer. The trial judge took the case under advisement because he wanted time to "absorb" the evidence.

On July 16, 1998, the trial court entered an order transferring the custody of Chelsea to respondent. The order also granted petitioner visitation, similar to the visitation previously awarded to respondent. Accordingly, the trial court granted petitioner a period of summer visitation with Chelsea. Chelsea, therefore, stayed with petitioner for her scheduled summer visitation. As soon as that period came to an end, petitioner filed a motion to stay the order of the trial court and a motion to reconsider. Petitioner engaged counsel to assist her in this matter. Petitioner retained custody during the time the motion to stay and reconsider was pending. The motion to reconsider was set for October 1, 1998.

On that date, respondent and his attorney appeared, and the trial court granted petitioner a continuance based upon her representations to the trial court that she had a back injury which prohibited her from appearing in court. In order to verify her incapacity, the trial court ordered petitioner to provide a doctor's statement within five days. Petitioner failed to supply such a statement. The hearing was reset for November 23, 1998. On November 20, 1998, petitioner's attorney filed a motion for a continuance due to a scheduling conflict in another matter. The trial court granted the continuance over respondent's objection and rescheduled the hearing for December 3, 1998. On that day, an order was entered that permitted petitioner to obtain a transcript of the trial court's *in camera* interview with Chelsea, to have the opportunity to lay a foundation to admit photographs which had been in her previous attorney's possession, to file additional pleadings, and to present additional witnesses. A hearing on all remaining issues. was then set for January 19, 1999. Petitioner did not file further pleadings or present additional evidence or witnesses. Another continuance was granted over respondent's objection.

On February 2, 1999, the trial court entered an order denying petitioner's motion to reconsider. On February 16, 1999, the trial court entered an order to enforce the transfer of custody previously ordered by the trial court on July 16, 1998. Petitioner filed a notice of appeal on March 4, 1999. On September 21, 1999, this court granted respondent's motion to dismiss the appeal because the issue of child support remained undetermined, thereby making the appeal premature. On October 27, 1999, the trial court entered an order which stated, *inter alia*, that petitioner was not required to pay child support because she was unable to obtain employment. Petitioner now appeals from the July 16, 1998, order that transferred custody of Chelsea from petitioner to respondent.

## ISSUES

### 1. *In Camera* Interview

Petitioner first contends that the trial court erred when it excluded her, a *pro se* litigant, from the *in camera* interview. Petitioner argues that the father was permitted to participate in the interview of the child through his attorney and that such one-sided participation was unfair and requires a reversal. We disagree.

■ Section 604(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/604(a) (West 1996)) allows for the interview of a child in chambers. It provides as follows:

"§ 604. Interviews. (a) The court may interview the child in

chambers to ascertain the child's wishes as to his custodian and as to visitation. Counsel shall be present at the interview unless otherwise agreed upon by the parties. The court shall cause a court reporter to be present who shall make a complete record of the interview instantaneously to be part of the record in the case." 750 ILCS 5/604(a) (West 1996).

The use of the word "may" in this section indicates that the choice of whether or not to conduct an interview is a matter within the trial court's discretion. *In re Marriage of Smith*, 114 Ill. App. 3d 47, 49, 448 N.E.2d 545, 547 (1983).

In the instant case, the trial court decided to interview Chelsea *in camera*. The *in camera* proceedings were recorded by a court reporter and made part of the record. Prior to retiring to chambers, the trial court informed petitioner that because she was appearing *pro se*, she would not be allowed into chambers but that respondent's attorney would be allowed into chambers. The transcript of the *in camera* interview indicates that Chelsea preferred to stay with petitioner. She stated that she did not want to be taken away from her mother. When asked by the trial court whether she would like to visit her father more often, Chelsea replied, "No, I'm fine." The trial court ruled contrary to Chelsea's stated preference and transferred custody from petitioner to respondent.

■ While section 604(a) of the Act provides that counsel should be present unless otherwise agreed upon by the parties, it does not give guidance as to how to proceed if one of the parties is appearing *pro se*. However, the entire purpose of the *in camera* interview is to allow a court to ascertain a child's preference free from the pressures and acrimony of open court. *In re Marriage of Hindenburg*, 227 Ill. App. 3d 228, 231, 591 N.E.2d 67, 69 (1992). We believe without question that special rules for the child witness in custody cases are necessary in order to attempt to eliminate the harm the child might suffer from an exposure to examination and cross-examination and to minimize, at least from the child's perspective, the adversarial nature of the proceedings. If a party is allowed in chambers during an *in camera* interview, the child's ability to be forthcoming would be impinged and pressure would be added to an already stressful situation for the child. Therefore, we cannot say that the trial court abused its discretion in not allowing petitioner in chambers when Chelsea was testifying.

We note that even if error occurred when the court allowed respondent's attorney in chambers and gave respondent's attorney the opportunity to submit questions to be asked without affording petitioner the same opportunity, we fail to see how petitioner was prejudiced. A review of the transcript shows that despite respondent's

attorney's presence in chambers, Chelsea testified that she preferred to stay with her mother (petitioner) rather than to have custody transferred to her father (respondent). According to Chelsea, she did not even prefer to have additional time with respondent. Thus, petitioner's claim that she was unduly prejudiced is without merit.

We suggest, however, that in the future, should a similar situation occur in a custody matter in which one party is represented by an attorney and the other party is proceeding *pro se*, the trial court should specifically explain to the unrepresented party that he or she is not entitled to be in the interview room because it would be extremely difficult for the child to be forthcoming about his or her preference if one or both of the parents were allowed to be in chambers. The trial court should then give the unrepresented party the option of submitting questions to the court to be asked during the interview of the child and explain that the other party's attorney also has the right to submit such questions. Finally, the trial court should explain that while the parties are allowed to submit questions to the court, it is within the court's discretion to determine whether or not to ask a question.

In the instant case, the trial court could have given petitioner the opportunity to submit questions to be asked of Chelsea during the *in camera* interview. However, our review of the transcript of the *in camera* proceedings shows that petitioner was not prejudiced by the trial court's omission. Accordingly, we are unconvinced by petitioner's argument that a reversal is required.

## 2. Standard of Proof

Petitioner contends that in its order modifying custody the trial court incorrectly applied the preponderance-of-the-evidence standard of proof rather than the appropriate clear-and-convincing standard of proof. Petitioner insists that in the instant case the issue which most concerned the trial court was petitioner's relationships with men but that the evidence revealed no connection between petitioner's relationships with men and an adverse effect on Chelsea. Respondent replies that there is sufficient evidence in the record to support the trial court's determination that a change in custody was in the best interest of the child. We agree with respondent.

■ Section 610 of the Act governs actions for the modification of a child custody judgment:

"§ 610. Modification.

\*\*\*

(b) The court shall not modify a prior custody judgment unless it finds by clear and convincing evidence, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has

occurred in the circumstances of the child or his custodian, or in the case of a joint custody arrangement that a change has occurred in the circumstances of the child or either or both parties having custody, and that the modification is necessary to serve the best interest of the child." 750 ILCS 5/610(b) (West 1996).

The clear-and-convincing-evidence standard requires more proof than a preponderance-of-the-evidence standard, but it does not require the degree of proof necessary to convict a person of a crime. *In re Custody of Dykhuis*, 131 Ill. App. 3d 371, 373, 475 N.E.2d 1107, 1109 (1985). Before a trial court can modify a custody order, the person seeking the modification must show that the modification is necessary to serve the best interest of the children. *In re Marriage of R.S.*, 286 Ill. App. 3d 1046, 1051, 677 N.E.2d 1297, 1300 (1996).

■ Petitioner cites to several remarks in the record in support of her contention that the trial court applied the wrong standard of proof. However, the trial court's July 16, 1998, order states, "The court finds that Mr. Meyer, by clear and convincing evidence, has proved a substantial change in circumstances and that it would be in the best interest of the [*sic*] Chelsea to change her custody to Steven Meyer." Thus, the trial court acknowledged the proper standard of proof in its order modifying custody. Moreover, a complete review of the transcript and the remarks made by the trial court therein make it abundantly clear that the trial court gave due consideration to this case and applied the appropriate standard. The trial court clearly agonized over its decision to modify custody, but the court ultimately believed that it was in the best interest of Chelsea to transfer custody from petitioner to respondent.

The evidence indicated that petitioner violated respondent's visitation rights, made unfounded allegations of sexual abuse against respondent's new wife's father, married four men after her marriage to respondent, lived with numerous other men, and forced Chelsea to move numerous times in order to accommodate petitioner's numerous relationships. Some of the men petitioner brought into Chelsea's life had a propensity toward violence. While petitioner may consider herself to be a good and loving mother, it is clear from the evidence that she put her own needs and desires first, at the expense of her children. On the other hand, respondent remarried only one time, and his new wife took an active interest in Chelsea and supported respondent's quest for custody. A psychologist who evaluated Chelsea and her family, including petitioner and respondent, opined that it would be in Chelsea's best interest to transfer custody from petitioner to respondent. There is no doubt in our minds, after our review of the evidence, that petitioner's numerous relationships with men and her

inability to provide a stable environment adversely affected Chelsea. After reviewing all the evidence, we cannot say that the trial court erred in finding, by clear and convincing evidence, that the changes in circumstances which had arisen since the prior custody order indicated that it would be in the best interest of Chelsea that she be in respondent's custody.

### 3. Manifest Weight of the Evidence

Respondent also argues that the trial court's decision to modify custody was against the manifest weight of the evidence. We disagree.

Child custody matters are within a trial court's discretion. The trial judge has heard the testimony of the witnesses, has observed their demeanor, and is in a better position to determine what is in the best interest of the child. *In re Marriage of Fuesting*, 228 Ill. App. 3d 339, 344, 591 N.E.2d 960, 963 (1992). A trial court's determination will not be reversed unless it is against the manifest weight of the evidence or is a clear abuse of discretion. *In re Marriage of Kleiboeker*, 262 Ill. App. 3d 644, 649, 634 N.E.2d 1329, 1332 (1994). For a finding to be against the manifest weight of the evidence, it must appear that a finding opposite to that reached by the trial court is clearly evident. *In re Marriage of Lima*, 265 Ill. App. 3d 753, 756, 638 N.E.2d 1186, 1188 (1994).

As previously stated, the evidence showed that petitioner had numerous relationships with men, some of whom she married and some of whom she did not. Some of these men were violent, and most were not around for more than a year or two. One of petitioner's former husbands testified that petitioner failed to encourage Chelsea to go to school. School records were introduced into evidence and showed that in the previous two school years, Chelsea missed 20 days of school each year. A plethora of evidence was introduced showing how petitioner had interfered with and violated respondent's visitation rights. A transcript of a message that petitioner left on respondent's answering machine indicates the degree of hostility petitioner possesses with regard to respondent. The court-appointed psychologist recommended that custody be transferred from petitioner to respondent. He believed that respondent was able to set aside his differences with petitioner for Chelsea's sake but that petitioner was unable to do the same and that respondent is the more stable and consistent parent of the two.

Based upon our review of the entire record, we conclude that a different result is not clearly evident. To the contrary, we find that there is more than enough evidence in the record to support the trial court's decision to transfer custody from petitioner to respondent. Therefore,

the trial court's decision is not against the manifest weight of the evidence.

### 4. Denial of Continuance

Petitioner's final contention is that the trial court abused its discretion when it denied her a continuance to obtain new counsel. We disagree.

The determination of whether to grant a request for a continuance is a question within the trial court's sound discretion, and its decision will not be disturbed absent a manifest abuse of that discretion. *In re Marriage of Miller*, 273 Ill. App. 3d 64, 67, 652 N.E.2d 396, 398 (1995). An abuse of discretion occurs only where no reasonable person would take the position adopted by the trial court. *McKenzie Dredging Co. v. Deneen River Co.*, 249 Ill. App. 3d 694, 700, 619 N.E.2d 188, 192-93 (1993).

■ In the instant case, petitioner's attorney, Rand Hale, filed a motion to withdraw on October 23, 1997. On that same date, a copy of a letter written by petitioner's attorney, which informed petitioner of the motion to withdraw and the date the motion was set to be heard, was entered in the court file. On November 7, 1997, the date that motion to withdraw was scheduled to be heard, an order was entered allowing petitioner's attorney to withdraw. Petitioner did not appear in court on that date. The record also shows that Mr. Hale forwarded to petitioner a copy of the trial court's order allowing him to withdraw, and he also sent her a letter in which he explained her options. The record indicates that petitioner received notice of Mr. Hale's motion to withdraw. Specifically, during the hearing on Mr. Hale's petition for attorney fees, petitioner admitted that she knew about the hearing on the motion to withdraw, but she explained that she was unable to attend because she had started a new job and could not miss work. Petitioner testified that she knew she needed an attorney but that she could not afford one.

On February 17, 1998, respondent's attorney sent petitioner a letter notifying her that the hearing date had been changed and that the hearing was rescheduled for March 12, 1998. On March 12, 1998, the trial court began the proceedings by noting that the trial began on August 4, 1997, and that on November 7, 1997, petitioner's attorney was allowed to withdraw. The trial court went on to state that since November 7, 1997, it had not heard anything from petitioner until two days before, when it was advised by a clerk that petitioner called and attempted to secure a continuance for the purpose of obtaining new counsel. The trial court then informed petitioner that she was too late, in that she had over two months to secure a new attorney but failed to do so. Petitioner then proceeded *pro se*.

Ultimately, the trial court entered an order transferring custody to respondent. Petitioner then found the necessary funds to hire a new attorney, who filed a motion to reconsider. At that hearing, the trial court ordered that the new attorney be given the opportunity to file pleadings and present whatever evidence should have been produced by petitioner when she was acting *pro se*. The trial court noted that if it determined that some evidence should have been produced, it would agree to reopen the file and allow that evidence, but it was not going to reopen and rehear the entire case. The record reflects that petitioner's new attorney did not file any additional pleadings. We agree with respondent that petitioner should not now be allowed to claim reversible error when she failed to take the opportunity given to her by the trial court to present additional information. Moreover, we point out that petitioner was represented on the first day of the trial, when more than sufficient evidence was presented to warrant a transfer of custody.

This case was delayed long enough. Petitioner had adequate time to secure a new attorney, but she failed to do so. After careful consideration and a thorough review of the record, we cannot say that the trial court abused its discretion in denying petitioner a continuance to obtain counsel.

## CONCLUSION

The law requires that custody matters be resolved in accordance with the best interest of the child and places upon the court the heavy burden of determining where that interest resides. After a thorough review of the record, we cannot say that the trial court's decision to transfer custody from petitioner to respondent was not in the best interest of Chelsea. We find no error on the record that would justify a reversal of the trial court's judgment in this case.

For the foregoing reasons, the judgment of the circuit court of Madison County modifying custody is hereby affirmed.

Affirmed.

HOPKINS and MAAG, JJ., concur.