*In re* MARRIAGE OF GAIL VERSTREATER, n/k/a Gail Roach, Petitioner-Appellee, and TED VERSTREATER, Respondent-Appellant (The Department of Public Aid, Intervening Petitioner-Appellee).

Fifth District   No. 5—01—0540

Opinion filed April 2, 2003.—Rehearing denied May 1, 2003.

R.W. Deffenbaugh, of Springfield, for appellant.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Diane M. Potts, Assistant Attorney General, of counsel), for appellee Department of Public Aid.

No brief filed for appellee Gail Verstreater.

JUSTICE KUEHN delivered the opinion of the court:

This case returns to our court by a supervisory order of the Illinois Supreme Court. On September 24, 2001, we dismissed this appeal because we determined that we lacked jurisdiction to hear it. On February 6, 2002, the Illinois Supreme Court denied Ted Verstreater's petition for leave to appeal but, by supervisory order, directed this court to reinstate his appeal. *Verstreater v. Verstreater*, 198 Ill. 2d 609, 762 N.E.2d 513 (2002). We address the merits of this case solely on the basis of the Illinois Supreme Court's supervisory order.

In his notice of appeal, Ted Verstreater contends that he is appealing from the trial court's May 21, 2001, order denying his motion to reconsider the October 4, 2000, order which found that he was in arrears on his child support obligations in a total amount of $13,310, that he had the ability to pay, that he was in wilful contempt of court for not paying, and that his posted bond in the amount of $13,000 should be disbursed to apply towards the arrearage. He also appeals from the trial court's June 22, 2001, order denying the State's motion to reconsider the May 21, 2001, order, which in part had stayed the disbursement of the $13,000 bond money pending appeal. We affirm.

Ted Verstreater and Gail Verstreater, now known as Gail Roach, were married in 1985. Their union produced five children. Gail was a homemaker. Ted had a variety of low-paying jobs during the marriage. The marriage began to fall apart, and by 1990, the parties were legally separated. Ultimately, the parties were divorced in 1992. Gail received custody of the five children, and Ted received visitation rights and the obligation to pay child support. Initially, he was ordered to pay $115 per week. Over the years, this child support obligation was modified or abated to reflect various periods of unemployment and/or job changes. There were times when Ted did not make his payments, and orders to show cause were entered. However, from our review of the record, it appears that for the most part, Ted made efforts to meet his child support obligations. From his 1992 divorce until 1999, his child support arrearage totaled $6,372.21, through numerous employment changes.[1] In September 1998, Ted filed papers to incorporate, and in January 1999, he opened his own car repair business. His two worst years of child support payments followed the opening of the business. In 1999, he paid only $400 of a $5,200 support obligation, for an additional

---

[1] By June 14, 1994, Ted's arrearage totaled $2,702.21, and upon court action by the State, Ted agreed to a judgment being entered against him in that amount. By the end of 1994, his additional arrearage was $15. For 1995, his arrearage was $355. For 1996, Ted incurred no arrearage. In 1997, Ted incurred a $1,400 arrearage. In 1998, he had a $1,900 arrearage.

$4,800 arrearage. The year 2000 did not bring about much change in the frequency of payments, and by the end of August 2000, Ted had only paid $1,440 of a $4,080 obligation, adding another $2,640 to his total arrearage.

Gail was receiving public aid throughout much of this time. Because of the funds that the State of Illinois was paying Gail on behalf of her children and because of Ted's inconsistent support payments, the Illinois Department of Public Aid (Department) filed its petition to intervene in this case. That petition was granted on July 7, 1994.

On September 2, 1999, the Department filed a petition for the adjudication of indirect civil contempt against Ted. The Department asserted that he had wilfully and contemptuously failed to pay child support, with $9,000 in past-due support owed. On October 8, 1999, the trial court ordered Ted to show cause why he should not be held in civil contempt of court for failing to pay this child support. Over the next several months, the Department sought to discover business and tax records from the date of incorporation of Ted's business forward. Ted hired and fired attorneys and ultimately filed a notice of compliance. The Department filed a motion to compel discovery to obtain the documents that Ted had refused to produce, including his 1998 income tax return and all records pertaining to his auto repair business. Slowly, in response to court orders, Ted produced some but not all of the requested documents.

While this discovery process was ongoing, Ted filed a motion to abate his child support obligation. He asked that the court retroactively reduce the amount he owed for weekly child support going back to the fall of 1998, when his employer went out of business.

At a status hearing, with all parties present, the trial court set the hearing on the rule to show cause issued against Ted, for May 18, 2000. As the date approached, a problem with the production of documents needed to present his side of the case caused Ted's attorney to file a motion to continue the hearing. Ted's attorney had previously instructed Ted to appear at the hearing unless otherwise notified. In any event, the trial court denied the motion for a continuance. On the morning of the hearing, his attorney's secretary finally made contact with Ted. Ted advised that he had car trouble and would not be attending this hearing. The trial court issued a body attachment for Ted in the amount of $13,000, with the specific ruling that the entire amount—not just 10%—had to be posted.

Ted was taken into custody pursuant to the body attachment on May 30, 2000. A friend posted the full amount of the bond the following day. This friend, James Edwards, was advised in writing that the

money might not be returned to him even if Ted appeared at every required hearing thereafter. James Edwards later admitted that he was aware that the bond money could be applied to Ted's child support arrearage.

In June 2000, Ted's second attorney asked the court for leave to withdraw from his representation. The motion was granted. Ted hired his present attorney. That attorney filed a motion, on Ted's behalf, seeking the return of the bond money. The trial court thereafter set the show-cause order based on the Department's petition for contempt, Ted's petition to abate, and Ted's motion for the return of his bond money for a hearing on August 28, 2000.

On that date, the court heard evidence on all of these pending matters. There is nothing detailing the evidence presented, and no record was created at the hearing. The docket entry for the date reflects that the trial court denied the motion for the return of the bond money, confirmed that the discovery cutoff had been April 7, 2000, found that Ted had the ability to pay the child support arrearage and that Ted had wilfully failed to pay that support, held Ted in contempt of court, and ordered the $13,000 in bond money to be applied to Ted's outstanding arrearage. The court additionally reduced Ted's support obligation to $78.75 per week retroactive to April 7, 2000, the date upon which he filed the motion to abate. The docket order concluded with a statement that a written order would be forthcoming.

The trial court signed a written order on October 4, 2000, although it was not officially filed with the court clerk until November 3, 2000. The written order essentially tracked the components of the written docket entry made months earlier.

On October 31, 2000, Ted filed a motion to reconsider. Because the motion to reconsider was filed prior to the date when the judgment was filed, the motion to reconsider was untimely filed. See *Archer Daniels Midland Co. v. Barth*, 103 Ill. 2d 536, 538-39, 470 N.E.2d 290, 292 (1984). Despite the untimely filing, the trial court considered this motion to reconsider, on March 28, 2001. The trial court's decision to consider the motion did not convert the motion into one that was timely filed or otherwise revest the trial court with jurisdiction. See *Barth*, 103 Ill. 2d at 538, 470 N.E.2d at 291; *Sears v. Sears*, 85 Ill. 2d 253, 260, 422 N.E.2d 610, 613 (1981). The trial court denied the motion by docket entry that date but did not file a written order until May 21, 2001.

After the March 28, 2001, hearing, Ted filed a motion to waive the appeal bond. The Department objected, but the trial court granted the motion. The Department filed a motion to reconsider this order, which was denied on June 22, 2001.

Ted filed notices of appeal following the entry of the May 21, 2001, order, and the June 22, 2001, order.

We dismissed the appeal on the basis that this court was not vested with appellate jurisdiction. Our dismissal was based upon the well-known rule of procedure that a notice of appeal must be filed within 30 days of the entry of the final order at issue. See 735 ILCS 5/2—1203 (West 1998); 137 Ill. 2d R. 272; 155 Ill. 2d R. 303. Ted's posttrial motion was not timely filed, because it predated the filing of the order to which his posttrial motion was directed. See *Barth*, 103 Ill. 2d at 538-39, 470 N.E.2d at 292 (the Illinois Supreme Court held that a September 20, 1982, motion to reconsider was untimely and did not extend the time for filing a notice of appeal when the signed judgment order was not filed until October 6, 1982). The Illinois Supreme Court apparently disagreed, because it ordered us to reinstate Ted's appeal. On that basis we address the merits of Ted's appeal.

On appeal, in four separate arguments, Ted contends that the trial court abused its judicial powers. He also argues that the trial court failed to return Ted's bond money.

### Continuance of May 18, 2000, Hearing

Ted argues that the trial court erred by denying his request for a continuance of the May 18, 2000, hearing on the show-cause order based on the Department's petition for contempt. By Ted's failing to cite authority in support of his argument on this issue, we could consider this matter waived. Despite this failing, we choose to address the issue.

■ The trial judge maintains the discretion to grant or deny a motion for a continuance. *In re Marriage of Knoche*, 322 Ill. App. 3d 297, 308, 750 N.E.2d 297, 306 (2001). Because the rule to show cause was initially filed in the fall of 1999 and discovery had taken place, the case was ready for a hearing. The case had already been continued once. Ted's attorney filed this motion a mere one day prior to the hearing's date. In his motion, he claimed that Ted had just received certain financial documents which required analysis by an accountant. Because the record reflects that the discovery cutoff in this matter was April 7, 2000, whether new financial data was ready for the May 18, 2000, hearing was irrelevant, since the evidence was likely inadmissible. Otherwise, we find no basis in the record to conclude that the trial judge abused his discretion in denying this motion.

### Holding Ted Verstreater in Contempt of Court for Failing to Appear at the Hearing

■ Ted contends that Judge Middendorff abused his judicial powers by holding him in contempt for failing to appear at the May 18,

2000, hearing, given the circumstances of his nonappearance. Ted claims that his attorney had told him that it was unnecessary to appear in court.

The decision to hold Ted in contempt of court for failing to appear at the May 18, 2000, hearing is within the trial court's discretion. Ted does not argue that the trial court lacks the authority to find a party in contempt for failing to appear at a court hearing. Instead, he argues that the trial court abused its powers by finding him in contempt in light of the fact that Ted had been advised not to appear in court by his attorney. He claims, in other words, that the trial judge's order of contempt was unfair under the circumstances. Ted presented no record of what the trial judge was told about his absence from the hearing. From an affidavit filed by his attorney at the time of the hearing, Gerry A. Ess, we are provided with some of the background facts. Gerry A. Ess's secretary began trying to reach Ted by phone as soon as the office was notified that the motion for a continuance had been denied. The purpose of the attempted contacts was to tell Ted that he must appear in court the following morning. She did not find Ted until the morning of the hearing. Ted claimed to have had car trouble that began the day before. He had not bothered to contact his attorney or the court to provide this information. He knew of the hearing and made no effort to secure alternate transportation to the courthouse. Gerry A. Ess testified, "I advised my client on May 17th that unless he heard back from me, that [sic] he needed to be at the hearing." He emphatically denies that he suggested or informed Ted that he did not need to appear at the hearing.

Ted's own excuse, which may or may not have been conveyed to Judge Middendorff on May 18, 2000, was that he had car trouble. He did not tell the court that his attorney told him that he did not need to be in court. In any event, his attorney's own testimony casts serious doubt on Ted's version of the facts. From our review of the record, we find no basis to conclude that the trial court abused its discretion in holding Ted in contempt of court.

## Setting the $13,000 Bond for Contempt of Court

■ Ted argues both that Judge Middendorff abused his powers by setting the bond at $13,000 without the presentation of evidence supporting that amount and that Judge Middendorff failed to follow the applicable body-attachment statute in setting the bond.

Ted is correct that the record does not reflect the foundation for the $13,000 at issue. Any error in the record's failing, however, falls upon Ted. Ted is appealing the trial court's decision, and thus he bears the burden to prove that no evidence had been received regarding the appropriate amount in which to set the bond.

Ted does not argue that the trial judge lacked the authority to enter an order for the attachment of the body in light of his failure to appear at the May 18, 2000, hearing. By statute, Judge Middendorff clearly maintained that right. 750 ILCS 5/713(a) (West Supp. 1999). In fact, the statute authorizes the judge to fix the bond in an amount equal to "a minimum of 20% of the total child support arrearage alleged by the obligee." 750 ILCS 5/713(a) (West Supp. 1999). Because the $13,000 bond amount was very close to the amount of arrearage Ted owed, it does not seem likely that the amount was selected with no basis in evidence. Was sworn testimony taken at this May 18, 2000, hearing? We do not know. Ted was not there, and so he cannot possibly advise us one way or the other. The same is true for his present attorney, R.W. Deffenbaugh. The charge of providing a full and complete record falls solely upon Ted and his attorney. While we understand that there was no tape recording or court reporter present at the May 18, 2000, hearing, the Illinois Supreme Court has provided the means by which a record can nevertheless be presented on appeal. In Supreme Court Rule 323(c) (166 Ill. 2d R. 323(c)), the court sets forth the proper procedure for this situation. A bystander's report may be filed, which is a proposed report of proceedings. In this case, the report of proceedings would have to be drawn from the recollections of the persons present at the hearing. In this case, a bystander's report is critical to knowing whether or not the proper evidence was adduced. With no record, we have no basis to find that Judge Middendorff abused his discretion.

### Allowing the $13,000 Bond to Be Applied to the Arrearage

■ Ted argues that Judge Weber failed to properly follow section 713 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/713 (West Supp. 1999)) in disbursing the $13,000 bond posted by an unrelated third party. Ted believes that Judge Weber did not have the authority to release the funds to the Department. Ted draws our attention to subsection (e) of that statute, which would have come into play if Ted had not appeared in court after his release from custody (750 ILCS 5/713(e) (West Supp. 1999)). If Ted had not appeared at this hearing, the statute would require the court to release the bond money to the obligee or public office (750 ILCS 5/713(e) (West Supp. 1999)). If this section is read in isolation, Ted's argument appears to have merit. However, this section is inapplicable.

On August 28, 2000, the parties and the attorneys were present in court for the hearing. Subsection (e) never came into play. Subsection (d) controlled that hearing, and it states as follows:

"Whenever an obligor is taken before the court by the Sheriff[]

or appears in court after the court has ordered the attachment of his body, the court shall:

(1) hold a hearing on the complaint or petition that gave rise to the attachment order. For purposes of determining arrearages that are due and owing by the obligor, the court shall accept the previous sworn testimony of the obligee as true and the appearance of the obligee shall not be required. The court shall require sworn testimony of the obligor as to his or her Social Security number, income, employment, bank accounts, property[,] and any other assets. If there is a dispute as to the total amount of arrearages, the court shall proceed as in any other case as to the undisputed amounts; and

(2) order the Clerk of the Circuit Court to disburse to the obligee or public office money held in escrow pursuant to this Section *if the court finds that the amount of arrearages exceeds the amount of the escrow.* Amounts received by the obligee or public office shall be deducted from the amount of the arrearages." (Emphasis added.) 750 ILCS 5/713(d) (West Supp. 1999).

We have no record of that hearing. Ted's goal at that hearing was twofold, based upon the motions that he had filed prior to that date. He sought the release of the bond money on the theory that he had been advised by his attorney, Gerry A. Ess, not to appear at the May 18, 2000, hearing. He also sought to have the amount of his support abated because he was struggling financially and could not afford the weekly amount previously set by the court. By the pleadings, we have no reason to believe that Ted disputed the amount of the arrearage.

Testimony and evidence established that the amount of his arrearage exceeded the $13,000 in escrow. Given the express statutory language, Judge Weber did precisely what the law required, by releasing the $13,000 in bond money to the Department.

### Failure to Admit Tax Returns for 2000 for Calculating the Arrearage

■ Ted argues that the trial court erred in failing to admit tax returns for the tax year 2000. He specifically states that this evidence was offered at the August 2000 hearing. Obviously, a tax return for 2000 could not have been prepared, or filed, prior to the end of the tax year 2000. Assuming that Ted is referring to an income tax return for 1998 or 1999, there remains an obvious relevance problem with this argument. Ted was under a court order to pay support in a set amount. No explanation was made in his appellate brief or in argument about how the information contained within an income tax return would have bearing upon the ongoing accumulation of a child support arrearage pursuant to an order of support. Additionally, the record clearly reflects a discovery cutoff of April 7, 2000. If Ted wanted the trial

judge to consider this return, he should have produced the return in discovery prior to that date. The trial court did not abuse its discretion in denying Ted's request to consider the income tax return at issue.

## Incorrect Calculation of Abated Child Support

■ Ted is happy that Judge Weber granted his motion to abate retroactive to the date when he filed the motion. However, he argues that Judge Weber's calculation was erroneous and that the child support amount should be even lower than that ordered. He contends that Judge Weber's error lies in his refusal to admit, and consider, the income tax return.

For the reasons stated previously in this opinion, Judge Weber's decision to refuse the admission of the income tax return was proper.

## Conclusion

For the foregoing reasons, the judgments of the circuit court of Montgomery County are hereby affirmed.

Affirmed.

MAAG and CHAPMAN, JJ., concur.