*In re* MARRIAGE OF BROOKS MARSH, Petitioner-Appellant, and FRANKIE MARSH, Respondent-Appellee.

Fourth District    No. 4—03—0022

Argued July 22, 2003.—Opinion filed November 13, 2003.

Brett N. Olmstead and J. Steven Beckett (argued), both of Beckett & Webber, P.C., of Urbana, for appellant.

Michael B. McClellan (argued), of Dodd & McClellan, P.C., of Champaign, for appellee.

JUSTICE STEIGMANN delivered the opinion of the court:

In December 1996, the trial court entered an order (1) dissolving the marriage of petitioner, Brooks Marsh, and respondent, Frankie Marsh, and (2) granting the parties joint custody of their four children, pursuant to their marital settlement agreement. In August 1999, Brooks filed a motion to modify custody and award him custody of the three children who were then minors (K.M., born June 1984; J.M., born July 1986; and L.M., born May 1991).

Following hearings in September and October 2001, the trial court entered a custody order (1) terminating joint custody; (2) granting Brooks custody of the parties' daughter, K.M.; and (3) granting Frankie custody of their sons, J.M. and L.M. The court reserved issues of child support, visitation, and attorney fees. In September 2002, the court entered a final judgment on modification of judgment. Later that month, Brooks filed a motion to reconsider, which the court denied.

Brooks appeals, arguing that the trial court abused its discretion by (1) awarding Frankie custody of L.M. and J.M., and (2) refusing to either grant his motion to reconsider or conduct an evidentiary hearing on the matters raised therein. We affirm.

## I. BACKGROUND

Brooks and Frankie married in 1981. Pursuant to the trial court's December 1996 dissolution judgment, which incorporated the parties' marital settlement agreement, Brooks and Frankie shared joint custody of their children. At the time of the hearing on Brooks's August 1999 motion to modify custody, Frankie had custody of K.M., J.M., and L.M. on weekdays and one weekend per month during the school year. Brooks had custody during the summer months and three weekends per month during the school year. Frankie lived in Champaign, where K.M. and J.M. attended Centennial High School (Centennial). Brooks lived in Mahomet with his wife, Tammy Marsh, their infant son, Alec, and Tammy's son from a prior marriage, Logan.

Because the parties are familiar with the evidence presented at the September and October 2001 hearings on Brooks's motion to modify custody, we review it only to the extent necessary to put the parties' arguments in context.

During an *in camera* interview with the trial court, J.M. discussed at length the following: (1) his feelings about living at Brooks's and Frankie's respective homes; (2) his attachments to Champaign and Mahomet and the friendships he has in each of those communities; (3) his feelings regarding his church in Champaign and Brooks's church; (4) his relationships with Frankie and Brooks; (5) his learning disability; (6) his mental health; (7) his parents' participation in his school and church activities; (8) his feelings about Centennial; and (9) where he would prefer to live.

In an *in camera* interview with the trial court, L.M. discussed what it is like to live with Frankie and Brooks, respectively. He also discussed his relationships with Frankie, Brooks, J.M., and his stepsiblings.

The parties presented extensive evidence regarding (1) Frankie and Brooks's inability to effectively communicate regarding the

children; (2) persistent disputes between Frankie and Brooks over pickups and drop-offs of the children; and (3) K.M. and her relationship with Frankie and Brooks. Because neither party disputes the trial court's order terminating joint custody and granting Brooks custody of K.M., we will not reiterate the evidence on those matters.

The evidence favoring Frankie as J.M. and L.M.'s custodial parent showed the following: (1) Frankie's school and work schedule allowed her to be home between 3 and 5 p.m. on weekdays; (2) Brooks was sometimes late picking up the children for visitation; (3) Brooks did not get home from work until 5:30 or 6 p.m.; (4) Brooks's job required him to travel two to three days per week; (5) Brooks occasionally had to be away overnight; (6) although he had a cellular phone, Brooks could not always be reached by phone; (7) on occasion, J.M. did not complete homework assignments when he had been with Brooks for the weekend; (8) J.M. and L.M. had friends at their Champaign schools and in their Champaign neighborhood; (9) Brooks sometimes intimidated J.M. while helping him with his homework; (10) Frankie attended many of J.M. and L.M.'s activities; (11) Frankie helped L.M. with his homework and when he did not have homework, she played games with him that involved math; (12) Brooks had made inappropriate remarks regarding Frankie in front of the children; (13) Frankie was supportive of the children's school and church activities; and (14) Frankie was very loving toward the children.

The evidence favoring Brooks as J.M. and L.M.'s custodial parent showed the following: (1) Frankie sometimes made Brooks wait when he arrived at her house to pick up the children for visitation; (2) Tammy and Brooks had rules and expectations for the children, and consequences for their failure to meet those expectations were understood; (3) J.M. and L.M. had friends in their Mahomet neighborhood; (4) J.M. and L.M. had a good relationship with Tammy; (5) Tammy and Brooks attended little league and soccer activities; (6) during the summers, Brooks took some time off from work to spend time with the family; (7) Brooks participated in outdoor activities with J.M. and L.M., such as bike riding and other sports; (8) Brooks could be reached on his cellular phone even when he was traveling; (9) Brooks had become more involved in monitoring J.M.'s homework assignment schedule; and (10) Frankie had made inappropriate remarks about Brooks in front of the children.

Evidence also showed that during the previous school year, J.M. was depressed and had trouble at school. On three consecutive days, Frankie telephoned a physician who had previously seen J.M., reporting that J.M. would not get out of bed or attend school. The physician prescribed Ritalin. Shortly thereafter, Brooks learned that J.M. was

taking Ritalin and contacted the prescribing physician. He objected to the prescription because he had not observed the type of behavior that Frankie had described to the physician, and school attendance records at least partially contradicted Frankie's claims. Brooks also had been told by a different physician that a diagnosis for ADD (attention deficit disorder) should not be made while J.M. was depressed. The prescribing physician discontinued the Ritalin prescription. At the time of the hearing, J.M. was taking Wellbutrin (an antidepressant) prescribed by another physician.

Tests had shown that J.M. had a learning disability that affected his reading skills. One of his physicians opined that J.M.'s inability to read at the same level as his classmates likely contributed to his feelings of low self-esteem and frustration with schoolwork.

At the conclusion of the October 2001 hearing, the trial court entered a custody order (1) terminating joint custody, (2) granting Brooks custody of K.M., and (3) granting Frankie custody of J.M. and L.M. Hearings continued on matters of child support, visitation, and attorney fees.

After the trial court entered its final judgment order in September 2002, Brooks filed a motion to reconsider, attaching the affidavits of K.M. and Brooks. In her affidavit, K.M. averred that (1) since the change in custody, she had been continuously employed and was doing well in school; (2) her relationship with Frankie had continued to decline; and (3) she was concerned for J.M. and L.M., who continued to have problems. Brooks's affidavit reported six dates on which Frankie did not have J.M. and L.M. ready to leave for visitation at the appointed hour. The motion also argued that the court should reconsider its decision based on the evidence already presented.

Following a December 2002 hearing, the trial court denied Brooks's motion to reconsider. This appeal followed.

## II. ANALYSIS

### A. The Trial Court's Custody Decision

Brooks first argues that the trial court abused its discretion by granting Frankie custody of J.M. and L.M. We disagree.

■ When making child custody determinations, the trial court should consider all relevant factors, including those listed in section 602 of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/602 (West 2000)), and decide what custodial order serves the children's best interest. *In re Marriage of Seitzinger*, 333 Ill. App. 3d 103, 107-08, 775 N.E.2d 282, 286 (2002). On review, this court affords great deference to the trial court's best interest findings because that court is in a far better position than are we to

"observe the temperaments and personalities of the parties and assess the credibility of witnesses." *In re Marriage of Stopher*, 328 Ill. App. 3d 1037, 1041, 767 N.E.2d 925, 928 (2002). We will not reverse a trial court's custody determination unless it is against the manifest weight of the evidence, is manifestly unjust, or results from a clear abuse of discretion. *Stopher*, 328 Ill. App. 3d at 1041, 767 N.E.2d at 929. This court will not substitute its discretion for that of the trial court and will find an abuse of discretion only where the trial court "acted arbitrarily without conscientious judgment or, in view of all the circumstances, exceeded the bounds of reason and ignored recognized principles of law so that substantial injustice resulted." *In re Marriage of Suriano*, 324 Ill. App. 3d 839, 846, 756 N.E.2d 382, 388 (2001).

At the conclusion of the October 2001 hearing, the trial court announced its custody decision from the bench and discussed at length its decision to grant Frankie custody of J.M. and L.M. In so doing, the court stated that (1) it had considered all of the statutory factors under the Dissolution Act (750 ILCS 5/602 (West 2000)); and (2) the decision regarding J.M. and L.M. was difficult. The court acknowledged that normally it would work toward keeping siblings together, but in this case separating K.M. from her brothers was justified.

The trial court acknowledged that Brooks had a real interest in the boys but determined that Frankie had been their primary custodial parent. The boys had lived in their Champaign home with Frankie since at least 1996 and seemed well adjusted to their home, their neighborhood, and their schools. J.M. expressed a strong preference for remaining in Frankie's home and continuing his education at Centennial.

The trial court found that Frankie truly loved the boys and was interested in their "well-being and development." The court noted the following observations from the home and background report prepared by Doctor Carol Diener: (1) " '[Frankie] is very creative and offers the children a great deal of her time and energy' "; (2) " 'Frankie is very sensitive to the needs of the children and is very involved in their lives' "; (3) " '[Frankie] is better able to take care of [J.M.]' ";.and (4) " '[Brooks] appears to downplay [J.M.'s] real problems and seeks to normalize behavior that is a cry for help.' " The court also found that Frankie's schedule was more amenable to taking care of the boys because she could be home on all weeknights and most weekday afternoons.

The trial court noted that the evidence related to the statutory factor of "parental preference" favored neither parent. The court found that the factor regarding "adjustment to environment" favored Frankie and attributed significant weight to this factor. The court

acknowledged that J.M. had problems with depression, self-worth, and confidence. In the court's opinion, those problems were going to demand attention and would be difficult to deal with regardless of where J.M. lived. The court further opined that to keep the situation as stable as possible, it would be best for J.M. and L.M. to remain in the environment they had been in for several years.

Finally, the trial court acknowledged that its decision was contrary to Diener's recommendation. The court explained that it was unable to discern from the report the reasoning behind Diener's recommendation.

■ Brooks contends that the above-stated factual findings were against the manifest weight of the evidence. Findings are against the manifest weight of the evidence when the correctness of an opposite finding is clearly evident. *In re Marriage of Knoche*, 322 Ill. App. 3d 297, 307, 750 N.E.2d 297, 305 (2001). As the trial court frankly stated, this case presented a close call. The evidence regarding custody of J.M. and L.M. did not overwhelmingly support or disfavor either parent. We conclude that sufficient evidence existed to support the court's findings.

We further conclude that the trial court did not abuse its discretion by granting Frankie custody of J.M. and L.M. The record shows that the trial court carefully considered all of the evidence and all of the relevant factors. The court did not ignore applicable principles of law, and its judgment does not "exceed[ ] the bounds of reason" so as to constitute an abuse of discretion. *Suriano*, 324 Ill. App. 3d at 846, 756 N.E.2d at 388. The teenage years can be difficult even in the most stable families and under the best of circumstances. Making the right custody decision for a troubled teen requires more sensitivity than review of a cold record affords, and where the emotional well-being of a youth is at stake, we are particularly reluctant to second-guess the trial court.

### B. Brooks's Motion To Reconsider

■ Brooks next argues that the trial court abused its discretion by denying his motion to reconsider. Specifically, he contends that the affidavits attached to his motion "established convincing newly discovered evidence that was not available at the time of the hearing that carried critical importance in showing the mistake of the court's earlier order." We agree with Brooks that, ordinarily, the trial court has discretion to grant or deny a party's timely filed motion to reconsider. However, in this case, the court did not have discretion to consider Brooks's evidentiary material. Instead, the court was required to deny the motion because it did not comply with the requirements of section 610(a) of the Dissolution Act (750 ILCS 5/610(a) (West 2000)

(providing that "no motion to modify a custody judgment may be made earlier than 2 years after its date, unless the court permits it to be made on the basis of affidavits that there is reason to believe the child's present environment may endanger seriously his physical, mental, moral or emotional health"). See *In re Marriage of Mitchell*, 103 Ill. App. 3d 242, 245, 430 N.E.2d 716, 718 (1981).

In *Mitchell*, 103 Ill. App. 3d at 244, 430 N.E.2d at 718, the trial court granted permanent custody of the parties' son to the husband in June 1980. In May 1981, the wife filed a motion for rehearing under what was then section 68.3 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 68.3), and what is now section 2—1203 of the Code of Civil Procedure (Code) (735 ILCS 5/2—1203 (West 2000)). *Mitchell*, 103 Ill. App. 3d at 245, 430 N.E.2d at 718. The court refused to consider her motion and instructed her counsel to file instead a motion to modify custody under section 610 of the Dissolution Act (Ill. Rev. Stat. 1979, ch. 40, par. 610 (now 750 ILCS 5/610 (West 2000))). *Mitchell*, 103 Ill. App. 3d at 245, 430 N.E.2d at 718.

The Second District Appellate Court affirmed, holding that the trial court's June 1980 custody order, although not a final appealable order, constituted a permanent custody order the modification of which could not be considered unless in accordance with the provisions of section 610 of the Dissolution Act. In so holding, the court wrote as follows:

> "It is clear from the record that the custody order entered June 4, 1980, was intended to be permanent. The fact that the order may not have been final for appeal purposes does not alter the fact that it was a conscious modification of the temporary custody arrangement[,] made after a testimonial hearing. Under such circumstances[,] it could only be altered upon a showing made in accordance with the terms of section 610 of the Marriage and Dissolution of Marriage Act." *Mitchell*, 103 Ill. App. 3d at 246, 430 N.E.2d at 719.

This case is analogous to *Mitchell*. Brooks filed his September 2002 motion to reconsider, requesting a new evidentiary hearing, within 30 days of the trial court's final judgment. However, the trial court's *permanent* custody order was entered in October 2001, and the parties (and their children) had been living under the terms of that order ever since. Thus, under *Mitchell*, in September 2002, the only means by which Brooks could challenge the October 2001 custody determination would have been to seek a modification of custody under section 610 of the Dissolution Act (750 ILCS 5/610 (West 2000)).

The *Mitchell* rule is consistent with the goal of section 610 of the Dissolution Act. By setting a high threshold for disturbing custody within two years of a permanent custody order, section 610 of the Dis-

solution Act promotes stability and continuity in the "custodial and environmental relationships" of children of divorce. *In re Marriage of Gustavson*, 247 Ill. App. 3d 797, 801, 617 N.E.2d 1313, 1316 (1993); see also *Department of Public Aid ex rel. Davis v. Brewer*, 183 Ill. 2d 540, 553, 702 N.E.2d 563, 568 (1998) (section 610 of the Dissolution Act seeks to discourage "ping-pong" litigation in custody disputes). If a trial court could reconsider and disturb its custody orders pursuant to a motion to reopen evidence filed within 30 days of the final judgment of dissolution albeit many months beyond the entry of the court's permanent custody order, the goal of section 610 of the Dissolution Act would be eviscerated.

We note that *Mitchell* is not inconsistent with the supreme court's holding in *Leopando* that a custody order is not appealable until all of the ancillary issues attendant to the dissolution are resolved. *In re Marriage of Leopando*, 96 Ill. 2d 114, 120, 449 N.E.2d 137, 140 (1983). The *Mitchell* court addressed the apparent conflict between *Leopando* and *Mitchell* by noting that a permanent custody order can be permanent and effective for section 610 purposes, even though it is not yet appealable. Thus, what *Mitchell* impliedly held was that parties are entitled to file section 2—1203 posttrial motions (such as motions for reconsideration or rehearing) (735 ILCS 5/2—1203 (West 2000)) following a trial court's entry of a permanent custody order, even though a final appealable dissolution judgment has not yet been entered. *Mitchell*, 103 Ill. App. 3d at 246, 430 N.E.2d at 719.

■ Consistent with *Mitchell*, we hold that section 610's two-year proscription on motions to modify custody, absent affidavits showing serious endangerment, starts to run when the trial court enters a permanent custody order, regardless of whether such order is entered contemporaneously to the final judgment of dissolution or earlier in the dissolution proceedings. We further hold that section 2—1203 posttrial motions challenging the court's custody determination must be filed within 30 days of the trial court's entering a permanent custody order.

In so holding, we emphasize that the two-year period of section 610 of the Dissolution Act starts to run in all cases upon the trial court's entry of a permanent custody order, and it starts to run only once. Accordingly, if a trial court bifurcates proceedings (as in this case) and a previously entered custody order goes unchallenged for many months, the date upon which the final judgment of dissolution is entered is irrelevant for purposes of calculating the section 610(a) two-year proscription period.

We further note that the *Mitchell* rule applies only to custody orders that are intended to be permanent, not temporary custody

orders, which by definition are modifiable. See *In re Marriage of Fields*, 283 Ill. App. 3d 894, 901-04, 671 N.E.2d 85, 89-92 (1996) (which discusses the differences between temporary and permanent custody orders). To avoid confusion, we strongly urge trial courts to notify the parties on the record when a child custody determination is intended to be a permanent custody decision.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

COOK, J., concurs.

JUSTICE TURNER, specially concurring:

I agree with the result reached by the majority and thus concur in its affirmation of the trial court's judgment. I write separately, however, because I disagree with the majority's holding "that section 610's two-year proscription on motions to modify custody, absent affidavits showing serious endangerment, starts to run when the trial court enters a permanent custody order, regardless of whether such order is entered contemporaneously to the final judgment of dissolution or earlier in the dissolution proceedings." 343 Ill. App. 3d at 1243. Because of the decision in *Leopando*, 96 Ill. 2d at 120, 449 N.E.2d at 140, the effect of the majority's holding is to trigger the application of section 610(a) of the Act (750 ILCS 5/610(a) (West 2000)) in cases that are not yet final for appeal.

As the majority notes, the goal of section 610 of the Act is to promote stability and continuity in the " 'custodial and environmental relationships' " of children of a divorce. 343 Ill. App. 3d at 1243, quoting *Gustavson*, 247 Ill. App. 3d at 801, 617 N.E.2d at 1316. Thus, affidavits must be filed under section 610(a) if a party desires to modify custody within two years of a final custody judgment in which the trial court has ultimately made a finding in the child's best interest (750 ILCS 5/610(a) (West 2000)). In my view, however, if the order is not appealable, it is not final for purposes of section 610(a). It is axiomatic that if the final order is immediately appealable, the party who has unsuccessfully sought custody of a child is entitled to have the trial court's judgment reviewed for error. However, under *Leopando*, 96 Ill. 2d at 120, 449 N.E.2d at 140, if other ancillary issues are still pending before the trial court, no right of appellate review attaches. Thus, the majority's holding may leave an unsuccessful party in a custody dispute without the ability to appeal and at the same time limit the

party's access to the trial court. Moreover, the holding's effect deprives the trial court of the opportunity to hear newly discovered evidence pertaining to the child's best interest unless section 610(a) affidavits are filed, even though the trial judge still has pending issues before it, some of which pertain to the child.

In the case *sub judice*, the trial court determined that the new evidence Brooks sought to introduce was merely cumulative and would not alter the court's original ruling. This ruling is supported by the record and was not an abuse of the trial court's discretion. I would, therefore, affirm on that basis. The trial judge was in a position, with matters still pending before it, to modify custody if doing so was in the children's best interest. The filing of section 610(a) affidavits is neither necessary nor warranted until the custody judgment is final for purposes of appeal.