# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*In re Marriage of Dorfman*, 2011 IL App (3d) 110099

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF BETH DORFMAN, Petitioner-Appellee, and BARRY DORFMAN, Respondent-Appellant. |
| District & No. | Third District<br>Docket No. 3-11-0099 |
| Filed | August 24, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court did not err in granting petitioner's request to remove the parties' children to Georgia, and in doing so, the trial court did not shift the burden of proof to respondent, the court's reference to electronic communication did not violate section 609(c) of the Illinois Marriage and Dissolution of Marriage Act and respondent agreed when the trial court ordered that if the parties could not agree on a visitation schedule, either party could move to have the court conduct a hearing on visitation. |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 08-D-246; the Hon. Dinah J. Archambeault, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Gregory Jumbeck (argued) and Mikal J. Stole, both of Reich, Jumbeck & Associates, LLP, of Joliet, for appellant.

James R. Brumund and Sarah M. Vahey (argued), both of Brumund, Jacobs, Hammel, Davidson & Andreano, LLC, of Joliet, for appellee.

Panel

JUSTICE O'BRIEN delivered the judgment of the court, with opinion.
Presiding Justice Carter and Justice Holdridge concurred in the judgment and opinion.

## OPINION

¶ 1    Beth Dorfman, the petitioner, filed a petition to remove the parties' minor children to Georgia. Barry Dorfman, the respondent, filed a motion asking the court to order Beth and the minors to move back to Illinois. After a hearing, the court granted Beth's petition. Barry appeals, contending that the trial court erred in granting Beth's petition for removal because it: (1) improperly considered the evidence in light of the applicable law and effectively shifted the burden of proof to him; and (2) failed to provide Barry with any visitation rights and improperly relied on the availability of electronic communications. We affirm.

¶ 2                                     FACTS

¶ 3    Beth and Barry were married on August 9, 1998. Beth gave birth to a son, Dylan, on January 12, 2001, and a daughter, Alayna (Lanie) on July 14, 2002. Thereafter, on February 8, 2008, Beth filed a petition for dissolution of marriage, and the court entered a judgment dissolving the parties' marriage on May 20, 2009. Pursuant to the terms of the judgment of dissolution, the court awarded Beth sole custody of the minors. The court reserved the matter of Barry's visitation and noted that he had yet to complete a parenting class. After the divorce proceedings, the court granted Barry varying terms of supervised visitation.

¶ 4    Beth moved with the minors to Georgia in June 2010, and she filed her petition to remove the minors on August 9, 2010. Barry filed a motion asking the court to order Beth and the minors to move back to Illinois. The court conducted hearings on the removal petition in December 2010 and January 2011. The record indicates that Barry acted *pro se*.

¶ 5    Barry and Beth testified at the hearings. Barry explained his mental health history and stated that he had been voluntarily institutionalized in the psychiatric wards of various hospitals on seven occasions between February and November 2008. The record indicates that on July 3, 2008, prior to one of Barry's admissions to the psychiatric ward, he left his sister, Barbara Dorfman, a voice mail stating that he had purchased a gun, and police

subsequently found him driving in Lockport, Illinois, the town in which Beth and the minors lived at the time. During Barry's testimony, he denied having a gun, but acknowledged that police found him driving around Lockport.

¶ 6     Barry also testified that he suffered from depression, but he believed that his depression was situational. He acknowledged that he informed Rita Murr, the guardian *ad litem* (GAL) for the minors, that he had been diagnosed with having borderline personality disorder. He also stated that he had been prescribed Lexapro to help manage his depression, but denied taking it at the time of the hearing. He denied ever taking any other psychiatric medications. Beth, however, introduced an e-mail from Barry indicating that he had been prescribed five psychiatric medications and that he filled three of the prescriptions. Beth also introduced additional e-mails from Barry that indicated that Barry needed his psychiatric medication to be able to live a normal life.

¶ 7     According to Beth, sometime around July 2007, Barry became convinced that she was having an extramarital affair, and so he began to "interrogat[e]" her on a monthly basis about her daily whereabouts. During Barry's questioning of Beth, he would either act as if he were in a trance or rage, depending on whether he could get the information he sought from Beth. Beth explained that these "interrogation[s]" occurred weekly starting in November 2007. According to Beth, half of the "interrogation[s]" occurred in the presence of the minors, during which time Barry had called Beth "a liar and a whore." Beth took a polygraph examination to prove to Barry that she did not have an affair, but the results were inconclusive due to problems with her breathing.

¶ 8     Barry acknowledged that the court had granted three emergency orders of protection in favor of Beth and against him. The orders were granted on: (1) January 5, 2008, in case No. 08-OP-93; (2) May 19, 2008, in case No. 08-OP-898; and (3) July 7, 2008, in case No. 08-OP-1197. The record indicates that Beth voluntarily dismissed the first order of protection in an attempt to save the marriage. The record also shows that the order of protection entered in case No. 08-OP-898 was subsequently dismissed, and the court entered a restraining order in its place. The restraining order granted Barry visitation with the minors, but forbade him from "physically or verbally abusing, harassing, threatening, or attempting to discuss issues with Beth Dorfman not related to the parties minor children or logistical necessities." The record further indicates that the court extended the order of protection entered in case No. 08-OP-1197 until July 26, 2012.

¶ 9     Barry admitted that prior to dismissal of the January 5, 2008, order of protection, he had violated it by approaching Beth while she was in the Flossmoor library. Beth explained that she visited the library frequently, while Barry did not. On the day of the violation, Barry approached her and asked to talk. Beth declined and called the police. Beth noticed that Barry had a black eye, but someone had already informed Beth that it was self-inflicted. Barry also acknowledged that he violated the restraining order by coming to Beth's work, but he contended that he "didn't think [he] was violating anything" at that time.

¶ 10    Beth also explained the basis of the order of protection entered in case No. 08-OP-898. Barry had become angry and had accused Beth of having "a hundred f*** friends that [he] kn[e]w nothing about," and ripped his underwear off of his body. Beth then gathered the

minors and attempted to leave their residence, at which point Barry threw Beth's car keys across the yard and shoved Beth to the ground. A neighbor intervened and helped Beth and the children leave. The following day, Barry attempted to remove Dylan from his school, but he was unsuccessful because the order of protection was already in place. Barry later called Judy Dorfman, his mother, and informed her that he was attempting suicide by sitting in a running car in a closed garage. The police subsequently rescued Barry, and he voluntarily entered the hospital for psychiatric help.

¶ 11     Barry also stated that the court had convicted him of two misdemeanor offenses of violating an order of protection, and he served jail terms on each conviction of 18 and 28 days, respectively. The court also convicted Barry of a third offense of violating an order of protection. This conviction was a felony, and Barry was sentenced to a one-year term of imprisonment. Barry's term of imprisonment for this offense began on December 22, 2009, and ended on June 22, 2010. At that time, he was released to Judy's home subject to an ankle monitoring device that prohibited him from leaving this residence without advance permission. The ankle monitoring device was to be removed on June 22, 2011.

¶ 12     Pursuant to the May 30, 2008, restraining order, Barry was granted visitation of various times for five or six days per week. In orders entered on August 21, 2008, and August 26, 2009, the court granted Barry supervised visitation of the minors for one day per week.

¶ 13     Barry exercised visitation with the minors on three occasions from May 31 to June 13, 2008; three times from September 1 to October 1, 2008; at no time between October 15, 2008, and January 5, 2009; and four times between January 10 and February 13, 2009. The record contains an e-mail from Barry to Beth dated April 1, 2009, where Barry requested that Beth stop sending him "report cards or anything else." In that e-mail, Barry further stated that he was "done," and that he "ha[d] no family . . . they [were Beth's] kids." Although the record does not disclose further specific information on Barry's visitation with the minors, it indicates that Barry filed a motion on August 17, 2010, stating that he was permitted to have contact with the minors, but that he also wanted visitation with them. Barry also testified that he had phoned the minors every day since August 2010, and that a recent visit with them had gone very well.

¶ 14     The record also contains numerous other e-mails and voice mails from Barry to Beth. Many of these messages were addressed to the minors, but Barry stated that he sent them to Beth's e-mail and voice mail accounts with the expectation that she would intercept them. In these messages, Barry generally accused Beth of having an extramarital affair, and specifically stated that "a whole bunch of dominos will come falling down on [Beth] and expose her for the liar, cheater, horrible person, breaker of the ten commandments she [was]. And yes, unfortunately, that [made] her a WHORE." Barry also wrote an e-mail that had "Dylan & Lane" in the subject, and continued in the body by stating that the minors "[we]re better off being raised by ANYONE who [did not] run off at night F*** other guys while their home with their father. You f*** WHORE!!! You're a f*** whore. How's your other daughter, you whore, huh? Everyone will know [the truth] soon, cuz I've got nothing to lose. So, the truth is coming out... YOU F*** SLUT, CHEAT, WHORE!!!!!" Barry also sent an e-mail with "Kids" in the subject line, and in the body called Beth "GARBAGE."

¶ 15    According to Barry, he was drinking heavily when he sent Beth these e-mails. Barry acknowledged that two men in Wisconsin had obtained orders of protection against him, because Barry left offensive and threatening voice mail messages for them due to his belief that they were involved in Beth's alleged affair.

¶ 16    Regarding Barry's reference to Beth's "other daughter," the record indicates that Beth had a daughter at age 18 and gave her up for adoption. While Beth's parents and Barry knew this information, Beth intentionally kept this information from her extended family, including her grandparents, aunts, and uncles. Barry admitted, however, that he had sent a letter to five of Beth's extended-family members stating that she had had a child at age 18 and that she had had an extramarital affair. Beth stated that Barry sent this information to over 10 of her relatives and that it had caused her problems with her family.

¶ 17    Beth also read some of the contents of two compact discs (CD) of phone messages left for her or the children by Barry. One disc was compiled on June 10, 2009, by the Mokena police department, and it consisted of 28 messages. The second disc was compiled by the department on November 3, 2009, and it consisted of 36 messages. Barry stipulated that he made the phone calls.

¶ 18    Barry specifically acknowledged that around March 2009, he left a voice mail for Beth with "threatening remarks such as: 'You will die' and 'Someone will kill you[.]' " Other voice messages included a threat that "[t]otally destroying [Beth was] the only thing [Barry] and [his] lawyer [wanted to] do." Barry also left a message for the minors that stated in part "join me in my hopes that Mommy gets hit by a truck head on while she's driving. Except it's more painful because that's what she really deserves. So join in with me, will you? I believe that will happen."

¶ 19    Barry explained that he had been treated by Dr. Mark Shukhman since September 9, 2009, for attention deficit hyperactivity disorder (ADHD), and Beth introduced notes Shukhman took in his treatment of Barry. Shukhman's notes indicated that during Barry's initial appointment with Shukhman, Barry did not inform Shukhman of his history of psychiatric hospitalizations, suicide threat, previous medications, or ongoing legal problems with Beth and the minors. Barry informed Shukhman that he did not have a problem with alcohol dependence and that he only consumed alcohol once or twice per week.

¶ 20    Shukhman prescribed Barry Adderall to help with his ADHD, and Barry contended that he used this medication appropriately. Shukhman's notes, however, revealed that during the first month that Barry took Adderall, Barry called Shukhman on October 6, 2009, and requested that Shukhman write a new prescription for it, because Barry had run out of it prior to his October 12 appointment. These notes also disclosed that prior to Barry's term of imprisonment in December 2009, he informed Shukhman that he was " 'doing quite well' " and that he felt "very balanced." However, during Barry's first appointment with Shukhman following his prison release, he told Shukhman that his problems were due to alcohol.

¶ 21    According to Barry, he opposed removal of the minors to Georgia. Barry testified that the schools in Georgia were "behind" those in Illinois. He also admitted that he had not worked since December 2008, at which time he held a job for one day before getting fired. Although Barry collected unemployment until November 2009, he did not pay Beth any

support for the minors. Barry also testified that he had not left a threatening voice mail or e-mail for Beth since November 2009, and he had not consumed alcohol since December 2009. He believed that he had already been punished for his behavior and wanted the minors to return to Illinois. Barry nonetheless acknowledged he verbally abused Beth and that the time he had spent in prison could not undo the mental terror he caused her.

¶ 22 Beth testified that as early as 2004 or 2005, Barry's alcohol consumption became a "noticeable problem" and that, around that time, he also began smoking cannabis, spending excessively, gambling, and viewing pornography. Barry informed her that he was abusing his Adderall medication by taking double his recommended dosage. Beth stated that his prescription bottle was typically empty one week before it should have been.

¶ 23 Beth also stated that Barry had left a message threatening to carve the letter A into her heart, but this message was not included on either CD compiled by the Mokena police. Beth also stated that in the past, Barry had referenced the O.J. Simpson case and stated that he would kill her if she ever had an affair. Beth feared that Barry would follow through on this threat, as he had threatened to send a letter to her extended family disclosing that she had had a child at age 18, and he had subsequently done so.

¶ 24 Beth stated that she was "fearful" and "terrified" of Barry. Beth explained that she relocated to Georgia on the day before Barry was released from prison in June 2010 and that since then, she has no longer had to "look over [her] shoulder after the threats that [Barry] made." Beth acknowledged that she relocated without first asking permission from the court, but she contended that she did not know she needed permission. According to Beth, Barry subsequently informed the minors that Beth violated the law by taking them to Georgia and that he and his family were angry. Beth also disclosed that she had recently had conversations with Barry that were to pertain to the minors, and she still saw "the signs of the anger and the obsession ***, and [that Barry] just [came] at [her] with accusations still." Beth testified that she was raising the minors in the Jewish faith, which was Barry's faith and not her own, and that she had also purchased gifts for the minors and told them that the gifts were from Barry.

¶ 25 In Georgia, Beth and the minors resided with her father and his wife, where they shared a four-bedroom home. Beth believed that the schools in Georgia were equivalent to those in Illinois and that the children were doing well and were engaged in extracurricular activities. Beth's father supported them financially, and he and his wife also helped with child care and transportation.

¶ 26 Beth also believed that she had better employment opportunities in Georgia. Beth explained that in Illinois, she had worked as a school psychologist and last earned a salary of $48,000 per year. However, she obtained an administrator's certificate in Georgia and was eligible for jobs that paid $60,000 to $70,000 per year. Beth also stated that the cost of living in Georgia was less than in Illinois. She explained that before she and the minors moved to Georgia, they lived in an apartment in a secure building due to her fear of Barry, which further increased her cost of living.

¶ 27 Beth stated that she would cooperate with visitation. She explained that the minors' school schedule provided a summer vacation from the end of May until August, week-long breaks in September, November, February and April, and a two-week break in December and

January. Beth was also open to weekend visitation. Beth was willing to purchase the minors' plane tickets between Illinois and Georgia, and she stated that these tickets cost $120 round trip if purchased in advance. Either Beth or an airline escort would accompany the minors on their trips.

¶ 28    Beth wanted visitation to be supervised, and because she enjoyed a close relationship with Barbara and Judy, she believed they could supervise and facilitate visitation, especially given that Barry resided with Judy. Beth explained that she wanted to keep visitation supervised because Barry had yet to receive any treatment for his alcohol abuse or obsessive and controlling behavioral issues. She also expressed a fear that Barry would resume his prior behavior once he completed his term of parole and the removal issue was determined. The record indicates that at the start of the second day of the hearing, Beth stated that she "would like the visitation to go forward this week" and that the minors were going to stay with Barbara for the weekend. Beth permitted Murr to determine the specific terms of that weekend's visitation.

¶ 29    Murr issued a report and testified. Murr explained that the instant case was her first one serving as a GAL. Murr also testified that at the time she prepared her report, Barry had not informed her of his previous alcohol use and did not furnish her with his medical records.

¶ 30    Murr opined that the court should deny Beth's petition for removal. Murr specifically indicated that she "ha[d] concerns that [Beth] left their home, a job, and uprooted the children without permission of th[e] court based upon her need to feel 'safer'." Murr further stated that Barry had never been physically abusive to Beth and that he could make threatening phone calls to Beth whether she lived in Illinois or Georgia. Murr concluded that Beth's "fear [did] not seem reasonable in light of all the circumstances."

¶ 31    Murr reported that Barry "adamantly believe[d] that [Beth] had an affair and admit[ted] to be[ing] occupied with that idea." Barry also expressed concern that the minors would not answer his questions regarding their whereabouts or daily activities. Murr's report indicated that Lanie "[was] tired of [Barry] talking about [Beth] and wanted him to stop." Lanie also disclosed that Barry told her that they were moving back to Illinois. Beth informed Murr that this information upset Lanie, and Lanie informed Murr that "she [did not] want to move and her life would be ruined." Murr related that Dylan was open to living in either Illinois or Georgia. Murr also explained that she sent an e-mail to Barry and Beth requesting that they not speak of the pending removal case with the minors, even though the e-mail was prompted only by Barry.

¶ 32    Murr disclosed that Lanie had heard her parents fight when they all resided together and that she "remember[ed Barry] pushing [Beth] and throwing the keys." Murr acknowledged that Lanie believed that Barry may harm Beth.

¶ 33    Murr stated that she did not believe that Beth's or the minors' lives would be better in Georgia, as Beth had "plenty of family" in Illinois to help her. Although the record does not indicate that Murr knew Beth's daily work schedule, she stated that "[t]here was no need for daycare" when Beth and the minors lived in Illinois because Beth worked at a school and had a schedule that mirrored the minors'.

¶ 34    Murr did not believe a reasonable visitation schedule could be reached if the minors

continued to reside in Georgia. She explained that although Barry had seen the minors once in the past 14 months, the proposed visitation would not be sufficient to allow Barry to bond with the minors, as the minors could only visit "four times during the school year plus two holiday breaks." Murr acknowledged that she observed a visit between Barry and the minors and that Dylan ran up to Barry and Lanie was "all smiles and giggling." Murr believed that Barry and the minors interacted well and that the minors obeyed him, and the minors referenced visiting Barry again.

¶ 35    Murr believed that Barry's visitation with the minors should be supervised, as Barry "ha[d] yet to work through all his anger at [Beth] and he may be apt to say things to the children about [Beth] in anger whether directly or indirectly." Murr acknowledged that Barry was currently seeing a counselor, and the counselor reported to her that she did not believe that Barry was likely to resort to violence against Beth or the minors, "considering that [Barry] had not been physically violent in the past."

¶ 36    The court took the matter of removal under advisement. The court also reserved the matter of Barry's visitation, finding that it would have to rule on visitation notwithstanding whether it granted or denied Beth's petition for removal. The court then stated that the parties could try to work out a visitation schedule, and that if they could not, one party could file a motion with the court and it would set visitation. Barry responded "[s]ure."

¶ 37    The court granted Beth's petition for removal. The court concluded that Beth's testimony regarding Barry's previous behavior and her continuing fear of him were credible, and it noted "appalling examples of [Barry's] violating behaviors, including voice mails and e-mails." The court also found that Barry's abusive behaviors were not entirely due to his alcohol consumption, and it noted that he had issues with legal and illegal drugs as well as his mental health. The court also expressed concern that Barry had not disclosed his suicide attempt, depression, borderline personality disorder, or obsessive behavior to Dr. Shukhman. The court found that "[Barry] remain[ed] a threat to [Beth]."

¶ 38    Regarding the factors articulated by the supreme court in *In re Marriage of Eckert*, 119 Ill. 2d 316 (1988), the court found that Beth wanted to move to Georgia due to a fear of Barry that "[was] well founded in fact." The court found that Barry objected to the move to preserve his relationship with the minors, and thus, both motives were without fault. The court further found that Beth's quality of life was enhanced in Georgia because she lived without fear of Barry, and noted that Beth's and the minors' needs were provided for in Georgia.

¶ 39    The court further found that visitation between Barry and the minors was limited, whether the minors resided in Illinois or Georgia, due to Barry's ankle monitoring device, the order of protection that was not set to expire until July 26, 2012, and the need for visitation to be supervised. The court believed that a reasonable and realistic visitation schedule could be reached due to the minors' liberal school break schedule and Beth's close relationship with Judy and Barbara. The court further stated that "[p]hone and Skype communications would be available."

¶ 40    The court also noted that Barry did not consistently obey court orders, given his repeated violation of the orders of protection, and that he failed to recognize his shortcomings and

blamed his problems on alcohol. The court also stated that it was "not convinced *** that once the ankle bracelet [was] removed that [Barry's] past behavior will not resurface as [Barry had] not taken sufficient steps to guard against relapse."

¶ 41    Barry appealed.

¶ 42                                    ANALYSIS

¶ 43                                    I. Removal

¶ 44    Barry argues that the trial court erred when it granted Beth's petition for removal. Specifically, Barry argues that the trial court improperly considered the evidence in light of the applicable law and effectively shifted the burden of proof to him.

¶ 45    Section 609(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/609(a) (West 2008)) provides, in relevant part:

"The court may grant leave *** to any party having custody of any minor child or children to remove such child or children from Illinois whenever such approval is in the best interests of such child or children. The burden of proving that such removal is in the best interests of such child or children is on the party seeking the removal."

¶ 46    In *Eckert*, 119 Ill. 2d 316, the supreme court held that a ruling on the best interests of the child in a removal action necessarily involves a careful consideration of the specific circumstances of each individual case. Reviewing courts grant great deference to the trial court's removal decision (*Eckert*, 119 Ill. 2d 316), as the trial court is in the best position to observe the parties and assess their personalities and capabilities. *In re Marriage of Guthrie*, 392 Ill. App. 3d 169 (2009). "The presumption in favor of the result reached by the trial court is always strong and compelling" (*Eckert*, 119 Ill. 2d at 330); thus, we will not reverse a trial court's ruling on a petition for removal unless it is contrary to the manifest weight of the evidence (*Guthrie*, 392 Ill. App. 3d 169). A judgment is against the manifest weight of the evidence when the opposite conclusion is clearly apparent or when the trial court's findings are unreasonable, arbitrary or not based on the evidence. *In re Custody of K.P.L.*, 304 Ill. App. 3d 481 (1999).

¶ 47    The *Eckert* court set forth five factors for courts to consider when deciding a removal petition: (1) "the proposed move in terms of likelihood for enhancing the general quality of life for both the custodial parent and the children"; (2) "the motives of the custodial parent in seeking the move to determine whether the removal is merely a ruse intended to defeat or frustrate visitation"; (3) "the motives of the noncustodial parent in resisting the removal"; (4) "the visitation rights of the noncustodial parent"; and (5) "whether *** a realistic and reasonable visitation schedule can be reached if the move is allowed." *Eckert*, 119 Ill. 2d at 326-27. Regarding visitation, a trial court may properly consider the degree to which the noncustodial parent has exercised his visitation in the past. *In re Marriage of Repond*, 349 Ill. App. 3d 910 (2004); see also *Eckert*, 119 Ill. 2d 316 (trial court may consider the fact that a noncustodial parent objects to removal, but has not exercised his visitation rights).

¶ 48    The *Eckert* factors are not exclusive, however, and the trial court should consider any and all relevant evidence in arriving at its decision. *In re Marriage of Collingbourne*, 204 Ill. 2d

498 (2003). No single fact or factor is controlling, and the weight to be given each varies from case to case. *Collingbourne*, 204 Ill. 2d 498. The trial court may further consider the potential of the relocation to increase the general quality of life for both the custodial parent and the children, including any benefit the children may receive from enhancement of the custodial parent's well-being. *Ford v. Marteness*, 368 Ill. App. 3d 172 (2006).

¶ 49       In this case, the court heard extensive testimony and properly considered the evidence in light of *Eckert* and its progeny. Our review of the record reveals that the trial court's determination to grant Beth's petition for removal was not against the manifest weight of the evidence.

¶ 50       First, considering the *Eckert* factors, our review of the record does not reveal that either Beth or Barry acted in bad faith in either seeking or challenging the removal of the children to Georgia. Specifically, Barry testified that he opposed removal because he felt as if he were recovering from his alcohol and behavioral problems and desired to spend more time with his children. Beth, on the other hand, sought to relocate to Georgia just prior to Barry's release from prison in order to feel safe from Barry's abuse, as well as to have financial, emotional, and child care support from her father and his wife. Thus, Beth did not seek removal as a ruse to frustrate Barry's visitation.

¶ 51       Furthermore, regarding Barry's visitation and whether a reasonable schedule could be reached with a relocation to Georgia, the trial court properly noted that under the circumstances of this case, the parties could reach a reasonable and realistic visitation schedule. The record indicates that the children's school schedule in Georgia provided frequent breaks that lasted at least one week. Additionally, the court correctly noted that a current order of protection and the supervised nature of Barry's visitation placed limits on the visitation. We note that these limits exist whether Beth and the children live in Illinois or Georgia. We further note that prior to Barry's term of imprisonment and the removal of the children to Georgia, he did not consistently exercise his visitation with the minors.

¶ 52       We also agree with the trial court's finding that the proposed move will benefit both Beth and the children. Beth testified that since she has moved to Georgia, she does not live in fear of Barry. We believe that Beth's fear of Barry is real and reasonable, as he left numerous voice mails and e-mails wishing her death and has violated the orders of protection. Further, as the trial court found, Barry has not sought help for the alcohol or behavioral problems that he claims were the source of the threats. We conclude that Beth's ability to live without fear of Barry directly enhances her life, and provides an indirect benefit to the children. Compare *In re Marriage of Krivi*, 283 Ill. App. 3d 772, 776 (1996) (appellate court reversed trial court's grant of mother's removal petition, and noted that although the parties engaged in a physical altercation, the record did not indicate a "pattern of violence" in their relationship and the father regularly exercised his visitation).

¶ 53       Additionally, the record indicates that Beth has shown cooperation in the past by raising the minors in Barry's faith and by purchasing gifts for the children and telling them they were from Barry. Furthermore, Beth will have assistance with child care, discipline, and finances from her father and his wife.

¶ 54       Overall, this record indicates that the primary catalyst for Beth's move to Georgia was

her fear of Barry, which was reasonable under the circumstances. We do not believe the trial court failed to consider the evidence in light of *Eckert* or that the trial court's determination to grant Beth's petition for removal was against the manifest weight of the evidence.

¶ 55                                    II. Visitation

¶ 56     Barry next contends that the trial court erred because it failed to provide him with any visitation rights, and it improperly relied on the availability of electronic communications when it granted Beth's petition for removal.

¶ 57     Pursuant to section 607(a) of the Act, a noncustodial parent is entitled to reasonable visitation, unless visitation would seriously endanger the physical, mental, moral, or emotional health of the children. 750 ILCS 5/607(a) (West 2008). The trial court is vested with broad discretion in determining matters of visitation, and we will not disturb a trial court's decision as to visitation unless the trial court abuses its discretion, or where a manifest injustice has been done to the children or the parent. *In re Marriage of Diehl*, 221 Ill. App. 3d 410 (1991).

¶ 58     A party cannot complain of an alleged error to which he consented. See *McMath v. Katholi*, 191 Ill. 2d 251 (2000). Furthermore, a party must properly preserve an issue for appellate review by objecting to the alleged error at trial. See *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1 (1996).

¶ 59     In this case, Barry is incorrect when he asserts on appeal that the trial court failed to provide him with any visitation. Rather, the trial court stated that whether it granted or denied Beth's petition for removal, a visitation schedule would have to be reached. The court then stated that if the parties could not agree on a visitation schedule, then either party could file a motion and the court would conduct a hearing on visitation. Barry responded "[s]ure." Thus, the record directly rebuts Barry's contention that the trial court failed to provide him with visitation. Moreover, not only did Barry not object to the trial court's procedure, he consented to it.

¶ 60     In any event, Barry has not cited, and we have not found, authority for the proposition that a trial court must provide a visitation schedule before or at the same time it offers a judgment on a petition for removal. See *In re Marriage of Marsh*, 343 Ill. App. 3d 1235 (2003) (court held a hearing in which it determined custody of the minors at issue, but reserved the matter of visitation); see also *K.P.L.*, 304 Ill. App. 3d 481 (in a guardianship proceeding, this court affirmed the trial court's decision to reserve the matter of a natural father's visitation).

¶ 61     We further conclude that the trial court did not violate the terms of section 609(c) of the Act when it granted Beth's petition for removal by noting the availability of electronic means of communication.

¶ 62     Pursuant to section 609(c) of the Act, a "court may not use the availability of electronic communication as a factor in support of a removal of a child by the custodial parent from Illinois." 750 ILCS 5/609(c) (West 2010). Here, however, the court's reference to the electronic communication was made in passing while discussing Barry's visitation potential. Specifically, the court noted that Barry was restrained by his ankle monitoring device and an

order of protection, that Beth would cooperate with visitation from Georgia due to her close relationship with Barbara and Judy, that visitation could occur during the week-long breaks from school and over the summer, and that "[p]hone and Skype communications would be available." Given this context, we conclude that the trial court did not improperly rely on electronic communication as a reason to grant Beth's petition for removal. The court simply mentioned this factor in discussing the opportunities for in-person visitation from Georgia, and it did not emphasize it.

¶ 63                                    CONCLUSION

¶ 64        For the foregoing reasons, the judgment of the trial court of Will County is affirmed.

¶ 65        Affirmed.