# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Marriage of Coulter*, 2012 IL App (3d) 100973

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF MELISSA LEE COULTER, Petitioner-Appellee, and DONALD R. COULTER, Respondent-Appellant. |
| District & No. | Third District<br>Docket No. 3-10-0973 |
| Filed | January 13, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court did not err in granting petitioner's request to remove her child from Illinois to accommodate her employment as a foreign service officer for the State Department, even though removal would have a significant impact on respondent's visitation rights, since the proposed move would greatly enhance the general quality of life for petitioner and her child, a reasonable visitation schedule could be achieved, and petitioner agreed to provide a means for substantial communication between the child and respondent via webcam, e-mail and telephone. |
| Decision Under Review | Appeal from the Circuit Court of Rock Island County, No. 04-D-614; the Hon. Frank R. Fuhr, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Douglas C. Scovil, of Ruud, Scovil & Marsh, of Rock Island, for appellant.

David G. Morrison, of Rock Island, for appellee.

Panel

JUSTICE CARTER delivered the judgment of the court, with opinion.
Justice Lytton concurred in the judgment and opinion.
Justice O'Brien dissented, with opinion.


**OPINION**

¶ 1     The petitioner, Melissa Lee Coulter, filed a petition for removal with respect to Gwenyth, the child whom Melissa had with the respondent, Donald R. Coulter. After a hearing, the circuit court granted the petition. On appeal, Donald argues that removal was not in Gwenyth's best interests because it drastically impaired his visitation rights. We affirm.

¶ 2                                          FACTS

¶ 3     In 2001, the parties married and Melissa gave birth to Gwenyth. The parties divorced in 2005, and Melissa was given sole custody of Gwenyth, subject to Donald's visitation rights. Donald's visitation consisted of two nights per week, every other weekend, and alternating holidays.

¶ 4     In 2010, Melissa filed a petition to remove Gwenyth from Illinois. The petition stated that Melissa obtained employment as a foreign service officer for the United States Department of State (State Department). Her career would consist of two-thirds overseas posts at United States embassies and one-third posts at the State Department in Washington, D.C. The posts would last for two to three years, with transitions typically occurring in summers. She would be expected to complete at least two "hardship" posts in which family members would not be allowed to accompany her due to either a low standard of living or dangerous conditions. In these instances, the State Department "provides a maintenance allowance for care of dependents by a designated guardian." If Gwenyth would not be allowed to accompany Melissa on these posts, Gwenyth would live with Donald and attend a local public school, and Donald would receive the full amount of the maintenance allowance.

¶ 5     Additionally, the petition stated that starting in May 2010, Melissa would undergo a 4- to 12-month training period in Virginia, during which time she would reside in an apartment in Falls Church. Gwenyth would stay with Donald between May and September 2010.

¶ 6     Melissa attached to the petition some information regarding overseas schools and schools in Falls Church, Virginia. Among other things, these data sheets reported that the American

students in the overseas schools had average SAT scores higher than the national average, and the Falls Church public schools also had average SAT scores higher than the national average.

¶ 7 Melissa also attached a proposed parenting agreement to the petition. Donald would receive visitation for the 10 weeks of Gwenyth's summer vacation; transportation costs would be covered by the State Department. The proposed agreement also stated that "[Melissa] will arrange and assume financial responsibility for the minor child to be chaperoned during travel from [her] residence to [Donald's] residence. [Donald] will do the same during travel from [his] residence to [Melissa's] residence." In addition, Donald would have an option to exercise visitation for one to two weeks during Christmas break in odd-numbered years and during Easter break in even-numbered years; transportation costs would be Donald's responsibility.

¶ 8 With regard to communication, the proposed agreement stated that Melissa would provide Gwenyth with a computer and Internet access so Donald could communicate with her via webcam and e-mail.

¶9 With regard to schooling, the proposed agreement stated that the State Department would cover the majority of Gwenyth's overseas schooling costs, and Melissa would cover any remaining costs.

¶ 10 On September 8, 2010, the circuit court held a hearing on Melissa's petition for removal. Melissa testified that prior to her State Department job, she worked for 4½ years as an editor at a local newspaper and made approximately $34,000 per year. Given economic difficulties in the newspaper industry, Melissa began looking for other employment in the Quad Cities area and in Chicago. She began looking into the foreign service officer job in late 2008 and, after a lengthy process, was offered the job in early 2010.

¶ 11 At the time of the hearing, Melissa was working in Washington, D.C., was earning approximately $60,000 per year, and had more comprehensive health insurance coverage than she had in Rock Island. She also stated she would be able to begin a college savings account for Gwenyth, which she could not do while working as an editor. Also, her apartment in Falls Church, Virginia, was more modern than her Rock Island duplex and had amenities she did not have in the duplex. Melissa's boyfriend lived with Melissa and Gwenyth in the Falls Church apartment. They began dating in February 2009, and he moved in with her in the Rock Island duplex in December 2009. They moved to the Virginia apartment in May 2010. Melissa's boyfriend had a good relationship with Gwenyth and assisted with her care, including getting Gwenyth from their apartment to the school bus stop and back again.

¶ 12 When asked why she selected the Falls Church, Virginia, area, Melissa stated:

"I looked at overall test scores, and then I also talked to other Foreign Service parents about their experiences with the school district, the various school districts, and Fairfax County was highly recommended. In fact, I think on the worldwide school fact sheet, where it compares the overseas schools to D.C. area schools, Fairfax County has the highest test scores."

¶ 13 Melissa also testified that she and Gwenyth had been involved in Girl Scouts in Rock

Island, and she planned to continue that involvement in Virginia. She had looked into the Girl Scouts program at Gwenyth's new school in Virginia, Glen Forest Elementary School. She also looked into other extracurricular activities, including after-school programs, soccer leagues, and dance academies.

¶ 14    Glen Forest Elementary School, which Melissa chose after looking into other schools in the area, was approximately 10 to 15 minutes by bus from Melissa's apartment. The school bus stopped at the apartment complex due to the number of children living in the complex who attend the school. The school was larger than Gwenyth's Rock Island school, had smaller class sizes, and, in Melissa's opinion, had better facilities. They also had an arts program, which her Rock Island school did not have. In sum, Melissa opined that the Virginia school was at least comparable to, and in several respects better than, the Rock Island school.

¶ 15    Melissa's job assignment in Washington, D.C., was scheduled to end in June 2011, but she would remain in the United States until sometime between March and July 2012. She had approximately 30 different overseas posts for which she could apply, and her preferences depended on the schools available for Gwenyth and the safety of the location. The State Department had a specific office set up to "assist with the schools and extracurriculars for kids, plan family outings for people at post, et cetera." Melissa had visited that office to view information about overseas schools.

¶ 16    With regard to the overseas schools, Melissa stated that "[t]here are 144 American-sponsored schools that get State Department funding, and there are other international schools and British schools available at–at post as well that all have English as the primary instruction language." Further, Melissa stated that she had preliminarily looked into these schools and assessed them according to the same criteria by which she assessed the Virginia schools.

¶ 17    On cross-examination, when asked why she wanted to have Gwenyth with her during the school year as opposed to the summer, Melissa stated that she believed it would be better to have her during school because she has been the parent more involved in Gwenyth's education and extracurricular activities, and that the uninterrupted 10-week block in the summer during break from school would allow Gwenyth to spend a lot of time with extended family members living in the area.

¶ 18    Donald testified that he was employed as a service technician with a cable television company. He worked Wednesday through Saturday from 8 a.m. to 5:30 or 6 p.m. He estimated that the parties' visitation schedule resulted in him having Gwenyth approximately 50% of the time, and his family helped watch Gwenyth on his work days. He was involved in Gwenyth's activities at school, although he admitted that Melissa participated in more activities than him. He also stated that he would not be able to afford the additional transportation costs contained in Melissa's proposed parenting agreement.

¶ 19    Counsel for Donald also called numerous witnesses who testified that Gwenyth was a happy and well-adjusted child. Gwenyth had significant weekly contact with several members of Donald's family.

¶ 20    On September 9, 2010, the circuit court issued a written order granting Melissa's petition.

-4-

In reaching its decision, the court recounted the facts and found:

"[T]he evidence clearly shows that the proposed move would greatly enhance the general quality of life of both the custodial parent and the child both directly and indirectly. The economic, social, educational and cultural opportunities afforded by [Melissa's] achievement of obtaining a position with the United States State Department as a Foreign Service Officer cannot be understated."

Further, the court also found that, while the impact to Donald's visitation would be significant:

"[I]n light of the fact that the United States State Department does provide economic assistance in transportation for the child from foreign countries to assist in visitation with a non-custodial parent, this Court believes that a reasonable visitation schedule can be fashioned, that, incorporated with the use of telephonic and Skype aided computer visits, will ensure that [Donald] continues with a close and loving relationship with his daughter."

¶ 21     Thus, the circuit court found that removal was in Gwenyth's best interests and granted Melissa's petition. Donald appealed.

¶ 22                                  ANALYSIS

¶ 23     On appeal, Donald argues that the circuit court erred when it granted Melissa's petition for removal. Specifically, Donald argues that removal was not in Gwenyth's best interests because it drastically impaired his visitation rights.

¶ 24     Section 609(a) of the Illinois Marriage and Dissolution of Marriage Act provides:

"The court may grant leave, before or after judgment, to any party having custody of any minor child or children to remove such child or children from Illinois whenever such approval is in the best interests of such child or children. The burden of proving that such removal is in the best interests of such child or children is on the party seeking the removal." 750 ILCS 5/609(a) (West 2010).

¶ 25     We will not disturb the circuit court's best interests determination "unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred." *In re Marriage of Eckert*, 119 Ill. 2d 316, 328 (1988).

¶ 26     Our supreme court has identified several factors that the circuit court should consider in assessing the child's best interests: (1) whether the move will enhance the quality of life for the custodial parent and for the child; (2) whether the custodial parent is motivated by a desire to hinder or defeat the noncustodial parent's visitation rights; (3) the noncustodial parent's motives for challenging removal; (4) the effect the move would have on the noncustodial parent's visitation rights; and (5) whether the move would still allow for a reasonable and realistic visitation schedule for the noncustodial parent. *In re Marriage of Collingbourne*, 204 Ill. 2d 498, 522-23 (2003). These factors are not exclusive. *Collingbourne*, 204 Ill. 2d at 523. In reaching its decision, the court should consider all relevant evidence and any other factors that are warranted by the context of the particular case. *Collingbourne*, 204 Ill. 2d at 522-23. Because factors two and three are not at issue in

this appeal, our analysis focuses on factors one, four, and five, as well as any other relevant considerations. *Collingbourne*, 204 Ill. 2d at 522-23.

¶ 27 With regard to the first factor, the circuit court found that "the evidence clearly shows that the proposed move would greatly enhance the general quality of life of both the custodial parent and the child both directly and indirectly." Clearly, the job provided Melissa with significant benefits over her previous position. Her salary nearly doubled, her health insurance was more comprehensive, and her Virginia apartment was an upgrade over her Rock Island duplex. She researched schools in the Washington, D.C., area and found a school for Gwenyth in Falls Church, Virginia, that was at least comparable in some respects to her Rock Island school and better in several others, including average SAT scores. The area also offered a range of extracurricular activities for Gwenyth, including activities in which Gwenyth had participated in Rock Island. Melissa also researched overseas schools, assessing them according to the same criteria she used to assess the Virginia schools, and her job provided assistance to families regarding assessment of overseas locations. The fact that Melissa did not provide more precise information on overseas locations is understandable, given the number of countries she had available to her with regard to applying for overseas posts. In sum, our review of the record in this case reveals nothing to indicate that the court's finding on this factor was against the manifest weight of the evidence. See generally *In re Parentage of R.M.F.*, 275 Ill. App. 3d 43, 47 (1995) (recognizing that relevant considerations on the first factor include "the possibility of a higher paying job, better schools, and improved general opportunities"); *Collingbourne*, 204 Ill. 2d at 528 (citing cases with approval for the proposition that the custodial parent should be afforded some deference in his or her determination as to what is in the best interests of his or her child).

¶ 28 With regard to the fourth and fifth factors, the circuit court acknowledged that the move would have a substantial impact on Donald's visitation. However, the court believed that a reasonable visitation schedule could still be achieved, and the record supports the court's findings on these factors. While Donald would not see Gwenyth as much as he did under the original visitation agreement, he would potentially have her for an uninterrupted 10-week period while she was on summer vacation from school, with significant financial assistance from the State Department for transportation costs and the remaining costs to be split evenly between the parties. During this time, Gwenyth would have the opportunity to have significant contact with extended family members in the Quad Cities area. In addition, even though Donald alleged that he would not be able to afford to pay for optional visitation, Melissa also proposed giving Donald the option of one of two holiday breaks during the school year.

¶ 29 Further, the testimony indicated that Melissa would continue to foster a relationship between Donald and Gwenyth. Melissa would provide Gwenyth with means for substantial communication with Donald via webcam, e-mail, and telephone. While we acknowledge that a court may not *rely* on electronic communication as a factor supporting removal (750 ILCS 5/609(c) (West 2010)), there is nothing prohibiting a court from *considering* it if it is relevant to the particular case (see *In re Marriage of Dorfman*, 2011 IL App (3d) 110099, ¶ 62 (acknowledging that communication via telephone and webcam can be properly considered in a removal decision)). This is precisely what the court did in this case, as evidenced by the

court's written order.

¶ 30 This is undoubtedly a difficult case, as the removal significantly decreases Donald's visitation time. Nevertheless, under the circumstances of this particular case, we cannot say that the circuit court's findings on the relevant factors were against the manifest weight of the evidence. See, *e.g.*, *R.M.F.*, 275 Ill. App. 3d at 48 ("[t]he presumption in favor of the trial court's decision is compelling in such cases and should not be disturbed merely because we might arrive at a different conclusion"). Accordingly, we hold that the court did not err when it granted Melissa's petition.

¶ 31                                                    CONCLUSION

¶ 32 The judgment of the circuit court of Rock Island County is affirmed.

¶ 33 Affirmed.

¶ 34 JUSTICE O'BRIEN, dissenting:

¶ 35 I respectfully dissent from the majority opinion. In making its ruling, the trial court found that the evidence "clearly shows that the proposed move would greatly enhance the general quality of life of both the custodial parent and the child both directly and indirectly. The economic, social, educational and cultural opportunities afforded by [Melissa's] achievement of obtaining a position with the United States State Department as a Foreign Service Officer cannot be understated." However, the evidence presented did not support that finding. Thus the court's ruling was against the manifest weight of the evidence.

¶ 36 The petitioner testified she would earn more money and have better health insurance but did not offer testimony that her living expenses would be lower. The petitioner did not offer any testimony regarding any new social or cultural opportunities that would become available to the child as a result of the removal. The petitioner could not tell the court where she would be stationed or for how long she would be stationed anywhere once her training was completed. The evidence was that until the completion of petitioner's training they would live in Virginia and then petitioner would be assigned to various posts across the world during her service obligation. If the petitioner's assignment was in a foreign country that was deemed "safe," the child would move with the petitioner, and if the assignment country was "unsafe," then the child would return either to Virginia or to Rock Island, Illinois. To that end, the only school the petitioner knew that the child would attend was the Glen Forest elementary school in Falls Church, Virginia. She could only opine that the child would attend that school until sometime in the spring of 2012. The petitioner did not testify where the child would attend school following the spring of 2012 because she did not know where she would be stationed. So while there was testimony that the Virginia school was comparable to, and in several respects better than, the Rock Island school, there was nothing more than speculation about where the child would live or go to school after the spring of 2012. That is simply insufficient evidence upon which to determine whether the move would enhance the quality of the life of the child.

¶ 37    At most the testimony demonstrated that the petitioner was not filing her removal petition to thwart the child's relationship with her father, that the petitioner would receive a significant increase in pay with better health insurance benefits, that the child would be able to maintain a relationship with her father via summer vacations and electronic communication, and that until mid 2012 the child would reside with her mother in an environment nearly identical to the Rock Island community. That evidence does not meet the standard for removal set forth by our supreme court in the *Eckert* case. *In re Marriage of Eckert,* 119 Ill. 2d 316, 518 N.E.2d 1041 (1988).

¶ 38    I would reverse the decision of the trial court.