**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 210150-U

Order filed September 9, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| ILLINOIS DEPARTMENT OF HEALTHCARE AND FAMILY SERVICES, *ex rel.* RIKAYLA P., | ) ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Petitioner-Appellant, | ) ) | |
| v. | ) ) | Appeal No. 3-21-0150 Circuit No. 16-F-836 |
| ALAN R., | ) ) | |
| Respondent-Appellee. | ) ) ) | Honorable Raymond A. Nash, Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices O'Brien and Wright concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  The circuit court's decision to deny mother's petition to relocate out of state with the minor child was not against the manifest weight of the evidence.

¶ 2    The petitioner, Rikayla P., appeals from the circuit court's judgment denying her petition to relocate with her son J.P. (born April 2015), that she shares with the respondent, Alan R.

¶ 3                                    I. BACKGROUND

¶ 4    Alan and Rikayla had a sporadic dating relationship since high school. When Rikayla was

20 years old and Alan was 21 years old, she gave birth to J.P. Rikayla and Alan were together at the time of J.P.'s birth but had an on-and-off relationship. In July 2016, the Illinois Department of Healthcare and Family Services filed a petition on behalf of Rikayla to determine the existence of a father and child relationship between Alan and J.P. In February 2017, the court entered a judgment of parentage, finding that genetic testing demonstrated Alan could not be excluded as the biological father of J.P. with 99.9% probability, and he was presumed to be J.P.'s father.

¶ 5        In January 2018, Alan filed a petition for an allocation of parental rights and parenting plan. In May 2018, the parties entered into an agreed order. Among other things, the plan provided Rikayla with significant decision-making responsibilities and the majority of parenting time and Alan with six hours of supervised parenting time every Saturday or Sunday (supervised by Rikayla). Supervision was in place over concerns of Alan's history with opioid abuse.

¶ 6        In July 2019, Alan filed a petition to modify the parenting plan, wherein he asked for 50/50 parenting time and electronic communication with J.P. He claimed that a significant change in circumstances occurred in that he had been sober since September 2018. The court ordered mediation, which did not result in any agreement between the parties. The matter was continued.

¶ 7                                   A. Petition to Relocate

¶ 8        In July 2020, Rikayla filed a petition to relocate with J.P. to Florida in the St. John's County area. She wanted to purchase a home with her boyfriend, Joe, who already relocated to Florida for work. Rikayla stated that she wanted to relocate to Florida for long-term stable employment, affordable housing, quality schools, and the presence of extended family. She explained that she was a registered nurse in Illinois and had started the process to obtain her nursing license in Florida, where there was a greater demand for healthcare personnel. Rikayla stated that, if the relocation were granted and an acceptable parenting time schedule could be arranged, she was willing to

2

facilitate and pay for appropriate transportation for J.P. to visit Alan in Illinois.

¶ 9    Alan objected to Rikayla's relocation petition. He provided that: he did not know Joe well enough to determine whether he would be appropriate to have a significant role in J.P.'s life; overall Illinois schools were ranked higher than Florida schools; Rikayla had yet to obtain a Florida nursing license; Florida had more nursing jobs available due to its higher rates of COVID-19 infections, which meant that Rikayla would be moving to a more dangerous area; Rikayla had not proven that she has a significant relationship with Joe, such that it would be responsible and in J.P.'s best interest to relocate, or that there was an established relationship between Joe and J.P.; there was significant room for improvement with the supervised parenting time and a relocation to Florida would be a detriment to his relationship with J.P.; Rikayla would not follow through on parenting time if allowed to relocate to Florida; J.P. had a significant relationship with him, his family, and his friends in Illinois; he had a relationship with J.P. for his entire life and a relationship with Rikayla on-and-off through the entry of the parenting plan in 2018; and the relocation petition lacked specifics and pertinent information to determine whether it would be in J.P.'s best interest.

¶ 10    B. Evidence

¶ 11    The court appointed a guardian *ad litem* (GAL) for Alan's motion to modify the parenting plan and Rikayla's relocation petition. The GAL conducted various interviews for the report, reviewed the case record, conducted a home visit at Rikayla's home, and observed Alan during supervised visitation. The following facts were gleaned from the GAL's report and the trial record.

¶ 12    Rikayla and J.P lived with Rikayla's parents in Plainfield. In addition to her parents, her two older brothers, an aunt, an uncle, and cousins also lived in Illinois. Rikayla was employed as a certified medical assistant on an as-need basis where she earned $30.65 per hour and averaged 25 hours per week. She stated that she wanted to relocate because she had better work opportunities

in Florida and wanted to move out of her parents' home, which could be accomplished by moving in with Joe. Rikayla had recently obtained her nursing license in Florida. She was questioned about her attempts to find suitable employment in Illinois, and she stated that she applied for 14 jobs in Illinois but only heard back from jobs in Florida. She had to turn down at least one job opportunity since she had yet to relocate to Florida. Rikayla stated that she was having difficulty finding suitable employment in Illinois. However, she admitted that she did not use her college's free career placement services, which reported that it placed 92% of its graduates within Illinois. Additionally, she used a recuiting service for jobs in Florida but not in Illinois.

¶ 13    The GAL conducted a visit at Rikayla's home when Joe was in town from Florida. J.P appeared to be fond of Joe and enjoyed playing with him and Rikayla. J.P. had a strong propensity for sports. The GAL noted that Rikayla and J.P. had a strong bond. Rikayla and Joe began dating in July 2019, and they were the same age. Joe worked for an Illinois company as a laborer and accepted a position in Florida as a lineman. He explained that his job was contractual and temporary, which would conclude when the project was finished. He expected that the project would take years to finish. Joe worked at least 60 hours a week earning $3,023 weekly. He expected to pay for Rikayla and J.P. to move to Florida and support them while Rikayla looked for a job. At the time of trial, Joe was living in a camper van, sometimes a hotel, with his parents.

¶ 14    Joe was questioned about an incident in May 2020, when he contacted Alan claiming that Rikayla was out drinking and not with J.P. and that he was going to break up with her. He told Alan that Rikayla was manipulative, unreasonable, and impossible to deal with. He stated that he since worked through the issue with Rikayla. Joe was also questioned about a photograph entered into evidence that showed him and Rikayla in a vehicle with an opened beer in the center console. Rikayla was in the passenger seat wearing her seat belt and Joe was in the driver's seat. However,

Joe claimed that he had not been driving, but instead, had been working on his truck, which had not run in a couple of years. Joe admitted he had two prior driving under the influence cases from 2014 and 2015 where he was found "not guilty." He was found guilty of improper lane usage.

¶ 15    The GAL acknowledged that the relationship between Rikayla and Joe was still new and that they were not engaged or married. She expressed concern over what would happen if the relocation was allowed and the relationship ended. Rikayla stated that if she and Joe were to break up, she would get her own place and still reside in Florida because she had wanted to move to Florida, regardless of Joe, for work and better neighbors.

¶ 16    Rikayla provided general information about schools and crime rates in Florida versus Illinois. The GAL found that the schools in Plainfield were comparable to those in St. John's County. Rikayla provided that she had extended family in Florida, but none of the family besides Rikayla's parents and brothers were around J.P. or close to Rikayla. Rikayla's mother admitted that Rikayla was only in contact with the family in Florida via Facebook, Rikayla had not seen them in several years, and there was no close relationship. Rikayla claimed that her parents were to retire in one to two years and move to Florida. Rikayla's mother stated that she would fly to Florida every other weekend to see Rikayla and J.P. The GAL noted that J.P. had a close relationship with Rikayla's mother and time away from the grandparents would impact him.

¶ 17    Alan was unemployed and resided in an apartment located in Wheaten, Illinois. He did not exercise his parenting time to the fullest. Sometimes he failed to exercise his parenting time or cut parenting time short. Alan provided pictures from the parenting time sessions where it appeared that Rikayla was close to J.P. or even holding him. This took away from Alan's ability to have parenting time with J.P. The GAL opined that a different supervisor would have been better to

5

allow J.P. to fully interact with Alan without Rikayla's unintentional interference. [1] Alan exercised his parenting time 34 of 52 times in 2018, 36 times in 2019, and 29 times in 2020, at the time the report was filed in early December 2020. Alan expressed frustration with Rikayla's presence during his parenting time and claimed that played a large role in his missed or shortened visits. The GAL observed J.P. and Alan interact and noticed that J.P. had fun, was comfortable, and enjoyed playing with Alan. Alan's family members in Illinois included his mother, aunt, uncle, cousins, and grandmother. He had no family members in Florida. Rikayla claimed that she brought J.P. to Alan's family functions because Alan did not have a relationship with them.

¶ 18    J.P. was five years old at the time of the GAL's report and could not express his preferences as to relocation. However, the GAL believed that time away from Alan would not have a major impact on J.P. due to the lack of parenting time already. Under the current parenting time arrangement, Alan's parenting time in hours totaled 13 days per year. The GAL believed he would be given more days if he were provided a weekend per month as proposed under the relocation plan. She thought that a plan could be enacted to facilitate travel for J.P. to see Alan for periods of time. For instance, Rikayla's parents had access to discount airfare and Rikayla or someone else would accompany J.P. during travel. The GAL also opined that Alan needed to have Facetime contact with J.P. on a consistent basis in order to preserve their relationship.

¶ 19    The GAL concluded that she did not see any issue with the relocation so long as Alan was provided parenting time and Rikayla followed through. However, she believed that the relocation may be premature until Rikayla had a more definitive plan of action. The GAL believed that J.P.

---

[1] After the GAL's report but prior to trial, the parties entered into an agreed order providing that Rikayla would no longer be the court appointed supervisor for Alan's parenting time with J.P. The parties agreed two of Alan's family members would be the new supervisors. Testimony at trial demonstrated that removing Rikayla as the supervisor benefited J.P.'s relationship with Alan and his family. J.P. was reported to be more open and loving.

6

would be fine if he moved to Florida and Rikayla would have job opportunities to support herself in case she did not marry Joe. Thus, she concluded that the relocation factors favored Rikayla's move. The GAL acknowledged that, although J.P. had the majority of his family in Illinois, the strong ties were only with Rikayla's family, and they stated they would travel to see Rikayla and J.P. in Florida. She also noted that the schools in Florida were comparable to the school J.P. would attend in Illinois if he did not relocate. The GAL emphasized that Rikayla's plan lacked specifics, for instance, she stated that the place where Rikayla would move within St. John's County had not been finalized so the court could not determine if the school was appropriate. The GAL stated that if the relocation were granted, Alan should be granted parenting time once per month on a long weekend from school. She recommended that if Alan canceled the visit, he be 100% responsible for the cost of transportation Rikayla incurred, and that he would not have his next scheduled visit until Rikayla was reimbursed.

¶ 20        Regarding Alan's pending motion to modify parenting time, the GAL recommended that his parenting time remain supervised but could be supervised by other specific family members. She suggested a plan where Alan's parenting time would gradually be increased over time and eventually involve overnights. If the plan went well, she opined that Alan should have unfettered parenting time at the end of July 2021. However, the GAL stated she did not believe the situation presented a 50/50 parenting time arrangement at that time. The testimony presented at trial largely aligned with the GAL's findings.

¶ 21                                C. Circuit Court's Judgment

¶ 22        On March 19, 2021, the court denied Rikayla's relocation petition and Alan's petition to modify the parenting plan was continued. The court discussed the statutory factors at length and concluded that relocation at that time was not worth the "gamble." Rikayla appeals.

7

II. ANALYSIS

¶ 24        A parent who is assigned the majority of parenting time may seek to relocate with the child. 750 ILCS 5/609.2(b) (West 2020). When ruling on a petition to relocate, the court considers the factors in section 609.2(g) of the Illinois Marriage and Dissolution of Marriage Act (Act):

> "(1) the circumstances and reasons for the intended relocation;
>
> (2) the reasons, if any, why a parent is objecting to the intended relocation;
>
> (3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment;
>
> (4) the educational opportunities for the child at the existing location and at the proposed new location;
>
> (5) the presence or absence of extended family at the existing location and at the proposed new location;
>
> (6) the anticipated impact of the relocation on the child;
>
> (7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs;
>
> (8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation;
>
> (9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child;

(10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and

(11) any other relevant factors bearing on the child's best interests." 750 ILCS 5/609.2(g) (1)-(11) (West 2020).

¶ 25    The parent seeking to relocate bears the burden of proving the move would be in the child's best interests. *In re P.D.*, 2017 IL App (2d) 170355, ¶ 30. Our supreme court has held, "[a] determination of the best interests of the child cannot be reduced to a simple bright-line test, but rather must be made on a case-by-case basis, depending, to a great extent, upon the circumstances of each case." *In re Marriage of Eckert*, 119 Ill. 2d 316, 326 (1988). A court's determination regarding the best interests of a child subject to a relocation petition will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Marriage of Coulter*, 2012 IL App (3d) 100973, ¶ 25. A court's decision is against the manifest weight of the evidence where the opposite conclusion is clearly apparent or where the ruling is unreasonably arbitrary or not based on the evidence. *In re Marriage of Kendra*, 351 Ill. App. 3d 826, 829 (2004).

¶ 26    It is well settled that reviewing courts must grant great deference to a court's relocation decision as it is in the best position to consider all relevant facts and observe the credibility of the parties. *P.D.*, 2017 IL App (2d) 170355, ¶ 18. "It is not the function of this court to reweigh the evidence or assess the credibility of testimony and set aside the trial court's determination merely because a different conclusion could have been drawn from the evidence." (Internal quotation marks omitted.) *Id.* ¶ 19. Thus, there is a strong and compelling presumption in favor of the results reached by the circuit court. *In re Marriage of Dorfman*, 2011 IL App (3d) 110099, ¶ 46.

¶ 27    Rikayla first argues that the court's analysis operated as a *de facto* elimination of the statutory factors and resulted in reversible error. Specifically, she contends that the court lost sight

of the purpose of the Act and ruled based on whether the facts met the court's preference for the values of the generations the court referred to as the "depression generation" or "grandparent's generation." Rikayla also mentions the court was not comfortable with Joe's "boyfriend" status. Second, she argues that the denial of her relocation petition resulted in a manifest injustice because it was inconsistent with the court's findings based on the evidence presented at trial.

¶ 28    Our review of the record reveals that the court heard extensive testimony and thoroughly considered the circumstances of this case. It is undisputed that the court considered the applicable statutory factors. Although it appears that the court went on a lengthy tangent regarding the difference in generations and whether Joe would ever be more than a boyfriend to Rikayla, it does not undermine the court's findings. Nonetheless, Rikayla spends a significant portion of her brief detailing each statutory factor and how the court's factual findings actually weighed in her favor. We decline Rikayla's invitation to reweigh evidence and set aside the court's judgment merely because a different conclusion could have been drawn from the evidence. See *P.D.*, 2017 IL App (2d) 170355, ¶ 19. Instead, we find ample evidence of record to support the court's decision.

¶ 29    One of the reasons Rikayla provided for wanting to relocate Florida was for better work opportunities. She stated that she applied for jobs in Illinois and Florida but was only successful in Florida by using a recruiting service. However, she did not use the same recruiting service for jobs in Illinois even though it had positions available. Also, Rikayla did not utilize free services offered by her college's career placement office, which placed 92% of its graduates in jobs in Illinois. Based on her limited attempt in obtaining employment in Illinois versus Florida, it is premature to conclude that there are better job opportunities in Florida. In her brief, she claims that "the court found credible that [she] would have better job opportunities in Florida based on having an Associate[']s Degree in nursing." We disagree with this characterization of the record. The

10

court stated that "[t]he opportunities in Florida may be considerable. I'm unsure how *** different they are here to Illinois." The court then went on to commend Rikayla for obtaining her associate's degree and stated that it would help her obtain better jobs—not specifically in Florida but anywhere. However, she could make herself more marketable by obtaining a bachelor's degree.

¶ 30        Alan objected to Rikayla's relocation petition because, among other things, he believed it would intrude on his parenting time. He expressed frustration throughout the proceedings with Rikayla's supervision during his parenting time and how it prevented him from exercising that time to the fullest. Additionally, Alan was concerned with whether the parenting plan would be followed through if Rikayla and J.P. were to relocate to Florida. The record demonstrates unproductive communication between the parties with areas in need of great improvement. Despite Alan's inconsistency with parenting time, the record shows that he and J.P. had a good relationship. After the GAL's report, but before the court ruled on the relocation petition, the parties agreed to (1) modify the parenting time order to provide that Rikayla would no longer supervise parenting time and (2) selected suitable supervisors from Alan's family. Since this change, J.P. and Alan have been able to have a closer relationship and J.P. became more outgoing and loving.

¶ 31        Regarding educational opportunities, the court found that Illinois and Florida had similar ratings, but that Illinois was far superior in terms of higher education. Since Joe was living in a camper van or hotel and Rikayla did not know the exact location of their potential move, the court was unable to consider the specific school district that would be considered. The court also touched on J.P.'s extended family in Illinois and Florida. The unrefuted evidence demonstrated that J.P. was extremely close with his maternal grandparents and his uncle, with whom he lived with in Illinois. Rikayla's parents provided that they could use airline benefits to visit regularly if the relocation was allowed. However, Alan and his family also lived in Illinois. The only extended

11

family noted to live in Florida were distant relatives of Rikalya that she had not seen in years and connected with on Facebook. The GAL's report noted that the relocation would have a minimal impact on J.P. as to community, school, and parenting time at his young age—especially because his grandparents planned to visit often. However, after the GAL's report, Rikayla was no longer supervising Alan's parenting time and it appeared that J.P. turned a new corner with Alan and his family and was creating a stronger relationship. This increases the impact on J.P.

¶ 32 Rikayla presented a parenting plan where J.P. would travel once a month to visit Alan in Illinois. The GAL noted that, at the time of her report, this would provide Alan with more parenting time overall than the six hour per week schedule that was in place. However, it is unclear how sustainable this plan would be as J.P. gets older as he had a propensity for sports and other opportunities for extracurricular activities may arise. We note that J.P.'s wishes were not taken into consideration due to his age. Regarding Rikayla's relationship with Joe, the evidence demonstrated they were in a committed relationship and Joe had a positive relationship with J.P. Though Joe contacted Alan and made disparaging comments about Rikayla, he later stated that they had worked through that particular issue in the relationship. As a final matter, Rikayla focuses on how the court's denial of her relocation petition by operation gives Alan another chance that he seemingly does not deserve. The court also noted how the denial of the relocation petition benefited Alan. However, the issue presented is not whether Alan should be given another opportunity, it is whether a relocation to Florida is in J.P.'s best interest. We emphasize that the decision on a relocation petition should never be made to punish a parent.

¶ 33 We find that the court's decision to deny Rikayla's petition for relocation is supported by the record in this case. We cannot say that an opposite conclusion is clearly apparent, or the determination was objectively unreasonable, arbitrary, or contrary to the facts established in the

12

record. As such, we conclude that the court's decision was not against the manifest weight of the evidence.

¶ 34    For the foregoing reasons, we affirm the circuit court's judgment.

¶ 35                    III. CONCLUSION

¶ 36    The judgment of the circuit court of Will County is affirmed.

¶ 37    Affirmed.